# United States District Court
## STATE AND DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA | **CRIMINAL COMPLAINT** |
| V. | Case Number: 08-MJ-364(FLN) |
| (01) THOMAS JOSEPH PETTERS | |
| (02) LARRY REYNOLDS | |

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about from January 1, 2000 through October 2, 2008 in Hennepin county, in the State and District of Minnesota defendant(s),

did create and execute a scheme and artifice to defraud and to obtain money and property by means of material false statements and false representations

in violation of Title 18 United States Code, Section(s) 371, 1341, 1343, 1956, 1957 and 1512.

I further state that I am a(n) Special Agent and that this complaint is based on the following facts:

  SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:  ☒ Yes   ☐ No

　　　　　　　　　　　　　　　　　　　　　　　Signature of Complainant
　　　　　　　　　　　　　　　　　　　　　　　Dan Harris
Sworn to before me, and subscribed in my presence,　FBI

10/2/08　　　　　　　　　　　　at　　St. Paul, MN
Date　　　　　　　　　　　　　　　　　City and State
The Honorable Jeanne J. Graham
UNITED STATES MAGISTRATE JUDGE
Name & Title of Judicial Officer　　　　　　　　　Signature of Judicial Officer

SCANNED
OCT 0 3 2008
U.S. DISTRICT COURT MPLS

STATE OF MINNESOTA        )
                                    ) ss.  AFFIDAVIT OF DAN HARRIS
COUNTY OF HENNEPIN      )

       I, Dan Harris, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

## AFFIANT'S BACKGROUND & EXPERTISE

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been for approximately 1 year. My duties and responsibilities have included conducting criminal investigations of individuals and entities for possible violations of federal laws, particularly those laws found in Title 18 of the United States Code.

2. I have participated in arrests and searches, and have participated in the execution of numerous search warrants for documents, records, and proceeds from illegal activities, and have participated in the subsequent investigation and analysis of evidence seized pursuant to these warrants. I have not included each and every fact known to me or other special agents participating in this investigation, regarding the crimes described in this affidavit.

3. This affidavit is submitted in support of a complaint charging THOMAS JOSEPH PETTERS and LARRY REYNOLDS with conspiracy, mail and wire fraud, money laundering, and obstruction of justice, in violation of 18 U.S.C. §§ 371, 1341, 1343, 1956, 1957, and 1512 respectively.

## CURRENT INVESTIGATION

4. I am currently assigned to a joint federal investigation with the Internal Revenue Service - Criminal Investigation Division and the United States Postal Inspection Service which is focusing on the business and financing activities of PETTERS COMPANY, INC (PCI), PCI affiliated entities and persons; NATIONWIDE INTERNATIONAL RESOURCES, INC. (NIR); and ENCHANTED FAMILY BUYING COMPANY (ENCHANTED).

5. This investigation has developed probable cause that THOMAS JOSEPH PETTERS (the owner of PCI); LARRY REYNOLDS, and employees of PCI and other PETTERS' entities; and other businesses have created and executed a scheme and artifice to defraud and to obtain money and property by means of material false statements and representations. The scheme involves fraudulently inducing investors to provide funds for, and financing to, PCI. Based on the fraudulent scheme, over 20 identified investors and investment groups have currently provided well in excess of $1 billion, and possibly substantially more, to PCI and related entities.

1

6. The primary method of effectuating the fraud scheme involves PETTERS, aided and abetted by other persons, creating fictitious documents and then providing these documents to current and potential investors as evidence that PCI is buying and selling substantial goods and merchandise which PCI will then resell. In many instances, funds from investors are sent directly to the purported supplier of the merchandise, NIR or ENCHANTED. In turn, NIR or ENCHANTED direct the funds to PCI (less a commission) without any merchandise. PETTERS and other persons then fraudulently pledge the non-existent goods and merchandise as security for the investments.

## COOPERATING WITNESS

7. A Cooperating Witness (CW) who is associated with PETTERS and PCI approached the government with documents and information establishing the fraud scheme. On September 8, 2008, during a proffer session with the CW and CW's counsel, the CW admitted to personal criminal culpability in the scheme, and agreed to cooperate in this investigation. In turn, the government agreed that it would accept a plea to a single count of conspiracy in violation of 18 U.S.C. § 371, with a maximum sentence of 5 years imprisonment and the potential for a cooperation agreement. During the proffer and in subsequent interviews the CW informed the government that:

   a. PCI is the venture capital arm of numerous PETTERS enterprises. The money raised by PETTERS through PCI is used by PETTERS for his other business ventures and to support his extravagant lifestyle.

   b. The fraudulent scheme was perpetrated by PETTERS; REYNOLDS (NIR), and other persons. The scheme began in the mid 1990's.

   c. PETTERS has solicited investors to invest substantial sums in PCI. To induce the investors to invest, the investors were advised funds would be secured by transactions (which were fictitious). Investors were then provided with false documents relating to the purchase and resale of merchandise. The fraudulent documents purport to evidence PCI purchasing merchandise from vendors such as NIR, located in Los Angeles, California, and ENCHANTED, located in Excelsior, Minnesota. Additional purchase orders falsely detail PCI's sale of the same merchandise to stores such as BJ's Wholesale Club, Levittown, Pennsylvania and Sam's Club, Bentonville, Arkansas.

   d. The purchase orders and other documents in support of the transactions are entirely fabricated. PCI does not buy merchandise from NIR or ENCHANTED. Nor does PCI sell merchandise as described in the purchase orders to BJ's Wholesale Club, Sam's Club or any other business. PETTERS uses these documents to induce investors to invest money.

e. On occasion, investors wanted to wire funds directly to NIR and ENCHANTED as payment for the fictitious purchase orders that had been provided by PETTERS and others to the investors. LARRY REYNOLDS (NIR) and another person (ENCHANTED) entered into agreements with PETTERS to receive these funds from investors and then send these funds to PETTERS, minus a percentage of the funds as compensation for their role in the scheme. This scheme tricked the investors into believing that PCI was actually reselling merchandise, when in fact PCI was not reselling merchandise.

f. An employee of PETTERS created false purchase orders and invoices related to the purchase of merchandise from NIR and ENCHANTED. Another employee was responsible for creating the false purchase orders related to the fictitious sale of merchandise to BJ's Wholesale Club, Sam's Club, Costco, and Boscovs.

g. PETTERS and others used the mail, FEDEX, and interstate wire communications in furtherance of the scheme, by sending documents via mail and interstate commercial carrier, and communicating in interstate commerce via wire transfer, by email and telephone.

8. The CW provided documents corroborating the allegations, including an itemized list of investors who are owed money by PCI, copies of numerous Promissory Notes, and copies of other lending documents that pertain to the scheme.

   a. A "Combined Balance Sheet" dated June 30, 2008, for PCI and affiliates indicates "total current liabilities" of $3.5 billion. The balance sheet reflects current accounts receivable (net) of about $1.9 billion. The CW advised that the accounts receivable are based on the false documents, and that actual accounts receivable are substantially less than that listed on the balance sheet.

   b. One example of a transaction identified by the CW as fraudulent, and corroborated by another agent's analysis of records provided by the CW, is as follows:

      i. PCI has eight outstanding notes with the Fidelis Foundation reflecting an investment totaling $27,620,000.

      ii. One of those notes, number 042308-5045, dated April 23, 2008, reflects that PCI obtained $4,350,000 from Fidelis Foundation, an agent for Minnesota Teen Challenge and Fidelis Foundation. Note number 042308-5045 bears the signature of PETTERS. A Security Agreement, that also bears PETTERS signature, reflects that Minnesota Teen Challenge and Fidelis Foundation will have a security interest in the following purchase orders which the CW indicated were fictitious:

3

   (1) PCI's Purchase order, number 49663, dated 4/17/08, to ENCHANTED for the purchase of 2,800 Hitachi Presentation Projectors. PCI's purchase price is $5,259,800.

   (2) Sam's Club Purchase order, number 9209679210, order date 4/28/08, to PCI for the purchase of 2,800 Hitachi Presentation Projectors. Sam's Club's purchase price is $5,838,364.

### CORROBORATION OF COOPERATING WITNESS

9. Agents provided copies of four purchase orders provided by the CW to a security official for Wal-Mart Stores, Inc. (corporate owner of Sam's Club). The purchase orders purportedly depict PCI selling merchandise to Sam's Club. Based on an analysis of records provided by the CW, PCI purportedly purchased this merchandise from both NIR and ENCHANTED.

    a. The Wal-Mart official reported that PCI's purported vendor number on the Sam's Club purchase order was fictitious. The official also stated that the purchase order numbers are not valid purchase order numbers for Wal-Mart stores or Sam's Club. These purchase orders reflect over $10 million in merchandise purchases from PCI.

    b. The internet site affiliated with Sam's Club states requirements for vendors seeking to do business with Sam's Club. One requirement is that vendors use EDI (Electronic Data Interchange) to exchange purchase orders, invoices, and all other transactional documents electronically. Another requirement is that suppliers use "Retail Link," an internet based system that suppliers use to meet requirements. The purchase orders provided by the CW are not consistent with EDI documents, but appear to be manually prepared purchase orders.

10. Agents have learned that First Regional Bank, Century City, California, reports that NIR and REYNOLDS have been receiving in/out wire transfers in substantial amounts since 2003.

    a. From January 2003 through March 2006, bank records indicate over $11 billion of in/out wire transfers for the NIR account. This number includes both wires into and wires out of the account. The bank indicated that NIR informed the bank of the following:

        i. NIR is a sales rep for PCI. NIR arranges for purchases of large quantities of merchandise from PCI to large retail stores. Settlement of these sales is handled through wire transfers. Incoming wires to NIR represent money for the product/merchandise that has been sold.

        ii. The following business day, an outgoing wire (generally to PCI) represents the cost of the merchandise/product less commission to nationwide.

  b.  The description provided by NIR to the bank explains the transactions, but is inconsistent with the actual NIR purchase orders (which NIR did not provide to the bank). These purchase orders reflect that NIR does not sell merchandise for PCI, but sells merchandise to PCI.

  c.  An analysis of the wires reported by the bank further corroborates the CW's description of this arrangement, in that the commission retained by NIR for receiving funds from investors, and then wiring the funds to PCI is approximately .05%. For example, from January 4, 2006 through January 10, 2006, NIR received $51,330,775 in 8 incoming wires. The day after receiving each wire, NIR wired the funds (less a .05% commission) to PCI.

11. Agents also obtained financial records related to ENCHANTED. A preliminary analysis of bank statements indicates that this entity received $35,013,540 in incoming wires from June 23, 2008 through July 14, 2008. From June 23, 2008 through July 18, 2008, ENCHANTED wired out $35,022,144.90, with substantially most of the funds going to PCI. Approximately $66,000 appears to have been sent to the owner of ENCHANTED. This also corroborates the CW's statement as to fees to ENCHANTED and another individual for re-wiring funds to conceal the existence of the fraud scheme.

## RECORDINGS

12. In September 2008, the government obtained consensually monitored conversations involving PETTERS, REYNOLDS, and other persons. Your affiant and other agents have reviewed these recordings, which were obtained by providing recording devices to the CW, and then directing the CW to record telephone conversations and in-person conversations with persons identified in this investigation. Many of these conversations took place in the office spaces of PCI. The CW has identified the voices on these recordings. These identifications are corroborated by statements of identification on the recordings themselves as well as video recordings.

  a.  In these recordings, PETTERS repeatedly admits executing the fraud scheme by providing fraudulent information to investors. PETTERS repeatedly discusses the stressed financial condition of his company, as well as the need to find more capital. Although at times PETTERS tells an employee that he doesn't want her to prepare false documents, he continues to ask her to prepare false documents, noting that he doesn't know what choice they have. PETTERS talks about fleeing the country and creating fabricated defenses if the fraud scheme is discovered.

  b.  PETTERS also attributes knowledge of, and participation in, the fraud scheme to REYNOLDS (NIR) and numerous other persons. PETTERS states that an investment broker told PETTERS that they are "a little paper manufacturing plant." On one

occasion, PETTERS states that he and the broker would be jointly implicated in a scheme to defraud investors out of $130 million.

c. In one recording, a PETTERS' employee admits that he, PETTERS and another person are "co-conspirators," and that he maintains records related to the fraud scheme. The employee further describes the fraud scheme as a "Ponzi scheme," and estimates that at least $100 million of PCI's debt is fraudulent.

d. The investment broker cautions that if investors send auditors out to visit warehouses where the merchandise is located, that the scheme would implode. The broker also asks that a PETTERS' employee prepare purchase orders to be submitted to investors so that the investors will extend the due dates on debt.

e. PETTERS' accountant tells PETTERS that federal auditors are examining his taxes, and will be examining PETTERS' expenses and deductions. PETTERS responds by admitting that he cheats on all those items. PETTERS and the accountant further discuss PETTERS illegally taking mortgage deductions on multiple residences.

f. REYNOLDS admits that PETTERS told him about the fake purchase orders, and that REYNOLDS has known about this for many years. REYNOLDS estimates the amount of fraud as in excess of $2 billion.

13. REYNOLDS and NATIONWIDE INTERNATIONAL RESOURCES, INC.

   a. The CW advised that NIR is affiliated with LARRY REYNOLDS. REYNOLDS assists PETTERS in executing the fraudulent scheme in numerous ways, including:

      i. REYNOLDS acts as a conduit for funds provided by investors directly to NIR, which REYNOLDS then delivers to PCI/PETTERS, less a percentage as a commission;

      ii. At PETTERS' request, REYNOLDS meets with and speaks to PCI's investors, falsely representing that his company is selling PCI large amounts of merchandise as depicted in the fictitious purchase orders;

      iii. REYNOLDS has arranged for representatives of insurance companies (insuring the fictitious goods) to tour warehouses of electronic goods owned by other companies, while representing that the goods are those sold to PCI; and

      iv. REYNOLDS has discouraged auditors for investors from viewing the merchandise by stating that the goods were in warehouses that were not accessible.

 b. In recordings summarized above, REYNOLDS admits to his participation in the fraudulent scheme. An analysis of wires further confirms his receipt of substantial sums of money as a result of the fraud, and then wiring these fraudulently obtained proceeds to PCI/PETTERS less a commission.

 c. Records obtained from NIR's bank, First Regional Bank, indicate that REYNOLDS provided false statements to the bank when questioned about the billions of dollars of wire flowing through the account from investors to PCI. These statements included misrepresenting the nature of NIR and NIR's relationship with PETTERS and PCI.

14. On October 1, 2008, PETTERS contacted a subject in this case, and encouraged that person to leave the United States to a country from where he could not be extradited. PETTERS also stated that REYNOLDS was planning to flee. Additionally, PETTERS indicated that he regretted recently turning over his passport to federal law enforcement agents.

15. Other witnesses and subjects in this case have reported that PETTERS has repeatedly contacted them after the execution of search warrants on September 24, 2008.

Further Affiant sayeth not.

                 _____
                 DAN HARRIS, Special Agent
                 Federal Bureau of Investigation

SUBSCRIBED and SWORN TO before me
on this 2 day of October, 2008.

_____