UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 08-364(RHK/AJB)

UNITED STATES OF AMERICA,       )
                                )
              Plaintiff,        )   GOVERNMENT'S PRETRIAL
                                )   BRIEF AND MEMORANDUM IN
v.                              )   SUPPORT OF THE GOVERNMENT'S
                                )   MOTIONS *IN LIMINE*
(1) THOMAS JOSEPH PETTERS,      )
                                )
              Defendant.        )

The United States of America, by and through its attorneys B. Todd Jones, United States Attorney for the District of Minnesota, and Joseph T. Dixon, III, John R. Marti and Timothy C. Rank, Assistant United States Attorneys, hereby submits the following Pretrial Brief and Memorandum In Support of the Government's Motions In Limine.

I.   SUMMARY OF THE EVIDENCE AT TRIAL

The government anticipates the evidence adduced at trial will prove the following facts:

A.   SEPTEMBER 8, 2008

On September 8, 2008, Deanna Coleman walked into the United States Attorney's Office with her attorney.  Coleman revealed to law enforcement that for more than 10 years she had assisted local businessman Thomas Joseph Petters execute a multi-billion dollar Ponzi scheme, using false purchase orders and numerous other documents.  The allegation was staggering.  Coleman claimed that Petters, Robert White and herself fabricated business documents to

fraudulently induce investors to lend Petters money, purportedly to finance Petters' purchase of electronic goods which would then be sold to big box retailers such as Costco and Sam's Club.  As with all Ponzi schemes investors were paid with new investor funds.

Coleman admitted her guilt and agreed to work with law enforcement.  Immediately, agents from the FBI and IRS provided Coleman with a recording device to record her conversations with Petters and others so as to substantiate her claims regarding the scheme and Petters' and White's involvement and to determine whether there were other knowing participants.  Within the first few hours of her return to Petters headquarters, Petters admitted the purchase orders were "fake" and claimed he believed "divine intervention" was the only explanation for how "we could of got away with this for so long."  See Gov't Exs. 9 & 9A.

For the next few weeks, Coleman recorded hours of conversations with Petters, White and others, capturing the conspirators discussing their financial crisis, the history of the scheme, as well as their efforts to maintain the scheme by obtaining new investor funds, to lull investors, and to plan how they could avoid responsibility if the fraud was discovered.

On September 24, 2008, approximately 100 agents from the FBI, IRS and the Postal Inspection Service executed simultaneous search warrants at Petters' headquarters, Petters' home and other locations.

2

B.    <u>THE PCI FRAUD</u>

The scheme itself was a common Ponzi scheme.  <u>See</u> Gov't Ex. 2.
Investors were told their money would be used to purchase
electronic goods that would be resold to big box retailers at a
substantial profit.  Oftentimes, investors were provided with
fabricated documents that purported to show the purchase of goods
by Petters Company, Inc. ("PCI") from a purported vendor and the
purchase of the same goods from PCI by retailers, such as Costco
and Sam's Club.  In some instances, investors were provided with
fabricated records that purported to show PCI wiring funds to the
vendor, giving the appearance to the investor that PCI was also
investing its own funds in the deal.  Investors also received PCI
financial statements, purporting to show that PCI was owed millions
and, at the end, billions of dollars (from retailers).  To induce
investors to provide the funds, Petters often personally signed
promissory notes.  He would also often provide personal guarantees
on the hundreds of millions of dollars he received from investors.

In large part, investors were not paid through profits from
real transactions, but were paid with money from other investors,
and sometimes, even their own money.

C.    <u>PETTERS COMPANY, INC.</u>

The heart of the fraud was PCI.  PCI was formed in 1994.  Its
sole owner is, and always has been, Thomas Joseph Petters.  Petters
was PCI's chairman of the board, chief executive officer, and

president.   The other employee throughout the history of PCI was Deanna Coleman (also known as Deanna Munson).   Petters had hired Coleman a year before, in 1993, when she was 26-years old, to work as an office manager and his assistant.   Petters was already in debt.

Initially, Petters and PCI were in the business of buying goods wholesale and selling them to retail outlets.   At its inception, PCI did real, modest-sized transactions.   Early investors in PCI were individuals who provided tens of thousands of dollars to Petters to finance the goods PCI purchased.

The fraud began when Petters started inflating and falsifying purchase orders to obtain additional funds from investors, which he used for his own purposes, namely to pay company expenses and to pay for his increasingly lavish lifestyle, cars and houses.   When Petters failed to timely pay an investor, Petters would simply buy time until he found additional investor funds, employing delay and evasion tactics that he would come to use again and again.   Among other things, he would (i) promise payment in the future; (ii) make false excuses, such as the retailers were slow in paying PCI; (iii) provide investors with checks with insufficient funds in the account, and (iv) ignore investors and refuse to communicate with them until forced to do so through court intervention.   By the mid-1990s, Petters was using overstated purchase orders.   When investors complained about non-payment or bounced PCI payment

checks, Petters made excuses and even agreed to repay them with other investors' money.

By the late 1990s, Petters was falsely claiming PCI did tens of millions of dollars, even hundreds of millions of dollars of business with retailers like Costco and others.  Petters gave Coleman the title of vice president and secretary, although her day-to-day responsibilities were completing investor paperwork, answering investor questions, and executing wire transfers.

In 1999, Petters needed false bank statements to provide to investors so they could verify PCI's purported bank transactions with retailers.  Coleman was incapable of creating these types of documents.  Petters turned to his friend and associate, Robert White.  White agreed to prepare the false bank records.  Petters then hired White, giving White the title of "chief financial officer" of PCI.  Coleman was responsible for fabricating the PCI purchase orders for the phantom goods and transferring funds to and from investors.  White was responsible for fabricating the retailer purchase orders and PCI financials.  Petters oversaw the scheme, sold the "investment" to new investors, and directed Coleman where to send the proceeds.  Throughout the years, Petters repeatedly told White and Coleman, orally and in writing, that he would figure out a way for them to escape the PCI fraud.  For example, on April 1, 2006, Petters emailed Coleman:

> The reason I sent you flowers this week is I spent a fair
> amount of time [c]rying about all I have done wrong in my

life (crying inside and out) I ask daily to be able to
get up and have God to help me change this company into
one we are so proud of instead of full of shame!  I am
determined and so are you.  I am so sorry that I ever got
you in this shit.  But I am not sorry for the fact that
I call you one of my best friends in the whole world!
For you have stood by in Pain, I owe you so many
apologies, now I need to fix it.  I am in [] it with you
an[d] Bob and toget[h]er we will take it out.   The
decisions I make I do not ever try to keep from you.

See Gov't Ex. 14.

The promised fix never materialized.

Instead, when law enforcement executed the search warrant at
Petters headquarters on September 24, 2008, PCI had purchase orders
that purported to show PCI was owed over $3 billion by Costco,
Sam's Club and other retailers.  None of them were real.  PCI owed
billions to its investors, but had virtually no assets to pay its
debts.  Within days, after the appointment of an outside receiver,
PCI declared itself bankrupt.

D.   PCI's "BILLION DOLLAR" VENDORS

In many instances, to protect against fraud, investors wanted
to send their investment funds directly to the vendor that was
purportedly supplying PCI with the electronic goods.  In doing so,
investors thought they were ensuring that their funds were used for
their intended purpose – to purchase merchandise.  What investors
did not know, however, was that Petters' purported vendors had been
recruited by Petters to assist him with the scheme.  Starting in
late 2001, Petters separately turned to two different business
associates, Larry Reynolds and Michael Catain, to assist him with

the scheme.  Petters used Reynolds and Catain to launder billions of dollars of investor funds through their business bank accounts back to PCI and Petters.

Larry Reynolds, a businessman from California, had a real wholesale business, Nationwide International Resources, Inc. ("NIR").  From time to time, Reynolds found modest deals involving shoes and clothes and sold them to retail outlets, including Petters.  In late 2001, Petters asked Reynolds to let Petters wire millions of dollars of funds through Reynolds' bank accounts.  In exchange, Petters agreed to pay Reynolds a fraction of a percent of the funds moving through Reynolds' account as a "commission."

Petters separately made the same proposal to Michael Catain. Petters told Catain that he was worried his investors would discover who his real vendors were and would steal his relationships.  Petters asked Catain to pose as PCI's vendor if he was ever questioned by an investor.  In early 2002, Catain created a sham company, Enchanted Family Buying Company ("EFBC"), and opened an account.  He too agreed to direct funds sent to his business account to PCI, less a commission, again a fraction of a percent.  This purported billion dollar vendor of electronic goods – the key to PCI's success – did no real business and had its headquarters in a small office above Catain's car wash only miles from Petters' headquarters.

Between January 2003 and September 2008, approximately $12 billion flowed through NIR's account into the PCI account.  Roughly the same amount also flowed through EFBC's account into PCI during the same period.  Each company was purportedly selling hundreds of millions of dollars in merchandise to PCI.  Accordingly, PCI should have been paying hundreds of millions of dollars to each vendor for the goods.  Yet, bank records show the money flowed from these two companies to PCI, not the other way around.

E.   <u>PROCEEDS FROM THE FRAUD</u>

On April 11, 2001, PCI opened a new bank account at M&I Bank. From the account opening until after the search warrants were executed in September 2008, there were only two people who were authorized to use the account – Tom Petters and Deanna Coleman. <u>See</u> Gov't Ex. 92.  From January 2003 until September 2008, approximately $35 billion was wired into the account.  <u>See</u> Gov't Ex. 5.  Virtually all of the funds were from investors or PCI's purported merchandise vendors, NIR and EFBC.   Although PCI was purportedly selling hundreds of millions of dollars in merchandise to retailers, virtually none of the deposits into the account came from retailers, such as Costco.  <u>See</u> Gov't Exs. 3 & 5.  The vast majority of the funds went to pay back investors (with other investors' money).  Millions of dollars went to Coleman and White and bonuses for other Petters employees (most of whom did not even work for PCI).   Tens of millions of dollars went to Petters

8

personally.  Hundreds of millions went to fund Petters' companies.
See Gov't Exs. 6 & 7.  Petters not only used hundreds of millions
of dollars in PCI funds for himself and his companies, he used PCI
funds to employ family members, to purchase properties for Petters
family members, and to fund businesses operated by other Petters
family members.

F.   EXPANSION OF THE FRAUD TO INSTITUTIONAL INVESTORS

In the 1990s, Petters started retail companies known as
Petters Warehouse Direct and RedTag.  Both companies bought and
sold real merchandise.  Both companies consistently lost money and
were subsidized with PCI fraud proceeds.  Indeed, in one instance,
after buying goods for Petters Warehouse Direct from a local
businessman, Petters suggested that the businessman provide Petters
with a fabricated purchase order for twice what Petters owed so
that Petters could use the false purchase order to obtain investor
funds to repay him.  The businessman declined Petters' suggestion.

In early 1998, Petters and PCI made the leap from individual
investors to institutional investors.  The huge institutional
investor, General Electric Credit Corporation ("GECC"), agreed to
provide PCI with a $50 million credit line to finance deals.  PCI
began drawing on the credit line to finance real transactions as
well as false transactions.  In late 2000, GECC became concerned
that PCI was not timely repaying its promissory notes under the
credit line and began asking Petters questions.  Among other

excuses, Petters claimed that Costco had delayed its payment to PCI.

On October 24, 2000, GECC did something new:  they sent a purchase order verification directly to Costco, only to be informed by Costco personnel that there were no such purchase orders. Costco immediately contacted Petters, seeking an explanation. Petters went into crisis management mode: During conversations with Costco personnel, Petters apologized to Costco, assured them that the person responsible had been identified and fired, and asked that he be allowed to take care of the situation with GECC. Petters even sent Costco a signed letter, acknowledging that the purported Costco purchase orders had never been issued. See Gov't Ex. 13.  Costco was concerned about its own liability, and Petters assured Costco he would advise GECC the purchase orders were not valid.

Notwithstanding his assurances to Costco, Petters never advised GECC the purchase orders were not valid.  Instead, Petters went on the attack with GECC.  In a series of telephone conversations and voicemails, Petters angrily attacked GECC for directly contacting "his" retailer for confirmation instead of working through Bob White, with whom Petters insisted they deal because they did not "understand" his business.  See Gov't Ex. 300 (voicemail transcripts).

10

GECC insisted that Petters immediately pay off PCI's credit line. Scrambling for time, Petters and White sent GECC eight PCI checks totaling, $38.5 million. Petters personally assured GECC that he had the funds to cover those checks. In one call, Petters even placed a person on the phone who he claimed was his banker to assure GECC that Petters had funds in the account to cover the checks. PCI's account did not have anything close to sufficient funds, and the checks bounced. Over the next weeks, Petters repaid GECC in multiple installments using funds from new investors.

In December 2000, Petters approached GECC about increasing the RedTag credit line. Petters offered to provide GECC with evidence purportedly establishing that Costco paid PCI for the purchase orders that had been questioned. Petters then directed Bob White to alter Costco checks received by PCI in real transactions to appear as the payments from Costco on the purchase orders, which were then sent to GECC. Upon receiving the checks, GECC called Costco's bank and quickly determined that the checks provided by Petters were altered. GECC called Petters and confronted him with what they had learned. Petters insisted that there had been some kind of mistake. GECC asked to see Petters' bank records, and Petters agreed. But GECC insisted that they be able to contact Petters' bank directly to verify the information he had been providing. Petters refused and attacked GECC, claiming that they

were too difficult to work with.  GECC was paid in full, and the credit line was terminated.

G.    THE PETTERS GROUP CORPORATE FACADE

In addition to Petters Warehouse Direct and RedTag, Petters purchased and operated other real companies, creating and maintaining a facade of a successful businessman.  The companies provided Petters a false air of legitimacy that lulled investors and provided some evidence of real transactions.

These companies were purchased with proceeds of the PCI fraud. Petters diverted hundreds of millions of dollars from PCI investor funds to purchase Fingerhut in July 2002, Polaroid in April 2005 and Sun Country Airlines in 2006.  See Gov't Ex. 8.  Moreover, virtually every company operated at a loss and was subsidized by PCI investor funds.  For example, in 2003, the Petters Group posted operating profits of $231 million: PCI purportedly had annual operating profits of $265 million while all of the other subsidiaries posted operating losses, sometimes substantial losses. See Gov't Ex. 73.  PCI wrote off millions of dollars in losses each year based on the losses it incurred from funding other Petters companies.

It was a well-known secret at the Petters Group that PCI was the financial engine for the Group, paying salaries, expenses and bonuses.  In turn, these companies provided Petters with the appearance of a corporate tycoon, which made it easier for him to

lure in new investors.  Based on the appearance of substantial personal wealth and corporate holdings, investors relied on Petters' salesmanship and personal guarantees for their investments.  Petters even used fraudulently obtained investor funds to make splashy charitable contributions, further enhancing his image and solidifying investors' confidence.

In a number of instances, when investors asked too many questions and sought a higher level of due diligence, Petters repeatedly and falsely claimed that his retailer relationships were confidential and would not permit investor inquiries.  When insurance agents tried to inspect warehouses, Petters personally intervened and claimed random inspections would not be permitted due to purported confidentiality agreements with retailers.  See Gov't Ex. 45.

## H.   KEEPING THE SCHEME AFLOAT

By the end of 2007, Petters and his associates were struggling to find new investors, limiting their ability to repay existing investors.  By December 2007, PCI was in default on hundreds of millions of dollars of notes held by one investor, the Lancelot Funds, which were operated by Greg Bell.  Petters told Bell his retailers were late in paying.  Bell agreed to sign an 90-day extension on the terms of payments, so that the notes would not be considered in default.

At the same time, Petters personally solicited new investors for additional funds but made no mention of his purported difficulty collecting from retailers or his inability to repay other investors.

By February 2008, at the end of the 90-day extension, Petters still could not repay the Lancelot notes.  Petters maintained that Costco was simply delayed in paying.  Bell and Petters met in Las Vegas and agreed that Bell would receive replacement purchase orders from other retailers for the purported Costco purchase orders held by Lancelot.  Bell suggested to Petters that they also exchange money so that there would be an appearance that the PCI notes were being paid in a timely fashion.

Throughout 2008, Petters scrambled for investor money from any source, continuing to falsely represent that he was buying and selling merchandise.  In March 2008, when Petters obtained a commitment of investor funds, he emailed Coleman stating he had obtained a $37 million investment and told her "you will have to fit the pieces together" as he was unable to talk with her on the phone because he was with a PCI investor at the time.  See Gov't Ex. 264.  Within 90 minutes, Coleman provided Petters with a product SKU number, purported pricing and quantity.  Petters emailed back, "I love you!!!  U r the only one who gets it!"  See Gov't Ex. 266.   Petters even turned to long-time, close friends and associates for millions of dollars, purporting to offer them an

investment opportunity to finance a purchase of merchandise. Petters did not use the funds as he claimed he would.  Instead, he used his friends' money to repay other investors, to repay his personal credit line and to finance Petters Group operations. Although he spoke to them about their investments numerous times, Petters never told his friends and associates that he had used their money for other purposes.

When asked by investors about repayment, Petters returned to tried-and-true tactics: (i) he claimed retailers were slow in paying; (ii) he claimed a retailer was in an audit; (iii) he claimed to be meeting with the retailers at their headquarters; (iv) he provided checks he knew would bounce; and (iv) he gave specific and detailed false assurances regarding the delivery of goods and repayment.  At one point, in August 2008, after a series of false claims, Petters told one investor that he had a family emergency and repayment would occur within days.  He forwarded his email to Coleman with the note:  "Dancing. . . . my sh[o]es have holes i[n] them . . ."  See Gov't Ex. 282.

When the government executed its search warrant in September 2008, Petters was still busily seeking new investment funds.

Even after the search warrants were executed by law enforcement on September 24, 2008, Petters continued to lull victim investors with false statements.  In recorded conversations during the prior days, Petters readily acknowledged PCI's impending

financial crisis.   Nevertheless, he continued to assure numerous investors (some of whom had invested their life savings) that they would be okay and that the investigation was unfortunate, overblown and unnecessary.   He continued to ask investors not to contact retailers.   He began blaming Deanna Coleman, claiming that a completed forensic accounting had determined that she had embezzled from the company.

At the same time, on October 1, 2008, Petters suggested to Robert White and Larry Reynolds that they flee prior to prosecution.   See Gov't Ex. 353A.

I.   TOM PETTERS – PRE-PCI

Through press releases, press interviews, and pleadings, Petters appears to defend himself by blaming others for the fraud that occurred at PCI.   He claims to be a victim, having had no knowledge of the fraud.   He claims to have played no role.

Yet even prior to PCI, Petters had a long history of executing the exact same type of fraud, diverting investor money from its intended purpose, using the same tactics employed by PCI.   In 1987, one investor provided Petters with approximately $80,000 to purchase VCRs.   Petters provided the investor with documentation and purchase orders establishing the existence of the merchandise. The money was sent to Petters, but the merchandise never arrived. In the fall of 1989, Petters had still not repaid the investors who complained to law enforcement.   On October 5, 1989, during an

16

interview with a detective, Petters admitted he had used the funds to pay off another one of his creditors instead of purchasing the merchandise, but blamed the circumstance on his business partner.

Six days later, on October 11, 1989, Petters borrowed $6,000 from a former boss, purportedly to buy electronic goods for resale. Petters agreed to repay the money no later than October 30, 1989. Petters failed to repay.  When civil action was threatened in December 1989, Petters agreed to pay, but he did not.  When litigation was re-initiated and a hearing was set for March 20, 1990, Petters claimed that he had filed for bankruptcy and provided the attorney with documentation of the bankruptcy filing as a justification for cancelling the hearing.  Later, the attorney learned that Petters had not filed for bankruptcy.  The attorney then re-initiated the lawsuit.  When a hearing was scheduled for December 1990, Petters called the court to cancel the hearing, claiming the matter had been settled.  Ultimately, Petters failed to appear at the court hearing, and the court granted a judgment against Petters.  The investor was repaid only after the sheriff was about to take possession of Petters' car.

On October 15, 1990, a retailer paid Petters $3,700 in advance for electronic goods that were never delivered.  After civil action was initiated in 1991, Petters contacted the retailer's attorney and requested the court hearing be cancelled, promising full payment.   Petters assured the attorney that he was sending

repayment via FedEx and even provided her with a FedEx tracking number.  After her call with Petters, the attorney found out that the FedEx tracking number did not exist.  The payment did not arrive.  Petters failed to appear at the hearing, and judgment was entered against Petters.

II.   <u>EVIDENTIARY ISSUES</u>

A.   <u>CO-CONSPIRATOR/AGENT STATEMENTS</u>

At trial, the government anticipates introducing a number of statements and documents made by the defendant's co-conspirators, Fed. R. Evid. 801(d)(2)(E), and corporate agents, Fed. R. Evid. 801(d)(2)(D).  <u>See</u> Gov't Ex. 1.

To show a statement falls under Rule 801(d)(2)(E), "[t]he government must prove by a preponderance of the evidence i) the conspiracy existed; ii) the defendant and the declarant were members of the conspiracy; and iii) the statement was in furtherance of the conspiracy." <u>United States v. Sturdivant</u>, 513 F.3d 795, 802 (8th Cir. 2008).  The Eighth Circuit has held that a trial court should make an explicit finding on the record that evidence as to the existence of a conspiracy is sufficient to render admissible the statements of co-conspirators. <u>United States v. Macklin</u>, 573 F.2d 1046, 1049 (8th Cir. 1978).

For purposes of the preliminary showing, in accordance with Fed. R. Evid 104(a), the government offers the following court records for purposes of establishing the existence of a conspiracy.

18

Bourjaily v. United States, 483 U.S. 171 (1987) (preliminary determination made under 104(a)).

 a. Deanna Coleman – The government will provide the Court with a copy of her plea agreement, entered into in open court under oath and filed with the Clerk of Court.

 b. Robert White – The government will provide the Court with a copy of his plea agreement, entered into in open court under oath and filed with the Clerk of Court.

 c. Michael Catain – The government will provide the Court with a copy of his plea agreement, entered into in open court under oath and filed with the Clerk of Court.

 d. Larry Reynolds – The government will provide the Court with a copy of his plea agreement, entered into in open court under oath and filed with the Clerk of Court.

 e. Greg Bell – The government will provide the Court with a copy of his plea agreement, entered into in open court under oath and filed with the Clerk of Court.

 f. James Wemhoff – Wemhoff served as the defendant's personal and business accountant (and PGW's Executive Vice President of Tax and Finance).  The government will provide the Court with a copy of his plea agreement, entered into in open court under oath and filed with the Clerk of Court.

19

B.    EMAILS

Subsequent to the search warrant and the appointment of the receiver, both parties obtained numerous company emails recovered from the company servers and back-up tapes.   The government has bate-stamped those emails obtained from the corporate receiver with a document ID number given to each document by the receiver's document management system, allowing the parties to confirm the authenticity and location of each document (email and/or attachment).

With respect to the vast majority of emails that the government intends to introduce at trial, they are either from the defendant or to the defendant.   As such, they are offered both as party-opponent admissions and for the non-hearsay purpose of evidencing the defendant's knowledge.

The key defense claim is an assertion that the defendant's long-time employee and corporate subordinate, Deanna Coleman, perpetrated the scheme without his knowledge.   Using the document management system, the government was able to isolate the email communications between and among specified individuals.   Given the nature of the defense, at a minimum, the government intends to introduce all recovered emails involving (1) private communications between only Petters and Coleman, and (2) private communications only among Petters, Coleman and White.   The Petters/Coleman recovered emails are voluminous (approximately 2,000 pages in 2

large binders).   Many of the emails pertain directly to PCI, investor funds and the use of proceeds.   Even the emails that do not pertain directly to PCI are relevant to demonstrating the nature of the close and subordinate relationship between Coleman and Petters and the frequency and candor or their communications, which plainly contradict Petters' defense.

While the government intends to review in court only a few dozen emails from the binders to show in open court, the volume, frequency and nature of the email communications itself flatly undermines Petters' claims that he was kept in the dark.   Moreover, the paucity of communications regarding merchandise transactions and the absence of emails regarding any inquiries by Petters regarding retailer relationships and retailer payments among the complete set of recovered emails is itself evidence of the defendant's knowledge and participation in the scheme.

C.   RELATED CONDUCT/PUTATIVE 404(b) EVIDENCE

1.   Misrepresentations to Pre-PCI Investors

Although not directly related to PCI, the defendant's conduct in 1989 - 1991, as set forth above, is admissible under Rule 404(b) as it goes to the defendant's intent, knowledge, and the absence of mistake, and the identity of the individual devising the scheme.

Under Federal Rule of Evidence 404(a), a party may not introduce evidence of prior bad acts to prove "action in conformity therewith," but it may be admissible as "proof of motive,

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Prior instances of fraud may be admitted under Rule 404(b) to show the defendant's intent to commit the charged fraud if the prior fraud is similar to and not too remote in time from the charged fraud.  See United States v. Sparkman, 500 F.3d 678 (8th Cir. 2007) (citing United States v. Fitterer, 710 F.2d 1328, 1332 (8th Cir. 1983); United States v. Calvert, 523 F.2d 895, 908 (8th Cir. 1975)).

Rule 404(b) evidence is admissible if it is: "1) relevant to a material issue; 2) similar in kind and close in time to the crime charged; 3) proven by a preponderance of the evidence; and 4) if the potential prejudice does not substantially outweigh its probative value."  United States v. Voegtlin, 437 F.3d 741, 745 (8th Cir. 2006) (internal quotations and citation omitted).

The evidence of his prior conduct is particularly relevant to rebut the defendant's claim that the same scheme was perpetrated without his knowledge.  See United States v. Campbell, 937 F.2d 404, 406-07 (8th Cir. 1991) (affirming admission of defendant's method of operating a prior failed venture because the defendant "in both cases, obtain[ed] a large line of credit secured by inventory, s[old] the inventory, then retain[ed] the proceeds without paying off the lender."); United States v. Serian, 895 F.2d 432, 434-35 (8th Cir. 1990) (affirming admission of evidence that the defendant had previously engaged in fraudulent business

ventures for purposes of proving the defendant's motive, plan and intent).

    2.   <u>Failure To File Tax Return Evidence</u>

The last tax return filed for PCI was for the tax year 2003. The last tax return filed for Petters personally was for the tax year 2005. The government will adduce evidence that tax returns were not filed for PCI or Petters, because PCI financial records were not made available to Petters' outside accountant (who later became PGW's Executive Vice President for Tax, James Wemhoff). Wemhoff repeatedly advised Petters of his inability to obtain the necessary information and his inability to file PCI and Petters' tax returns without corporate information, namely books and records. Petters did not provide Wemhoff with access to the records.

In addition, Wemhoff will testify that Petters falsely characterized transfers of PCI funds to Petters as loans rather than as income, even though Petters used the funds for himself. Wemhoff will testify that PCI funds were readily used by Petters as a personal coffer for Petters' personal use and for Petters' other business activities.

The tax evidence is best understood as intrinsic to the fraud, as it is directly relates to the use of PCI funds and the defendant's knowledge that PCI books and records were not transparent. As intrinsic evidence, it is not subject to the

limitation set forth in Fed. R. Evid. 404(b).  See United States v. Johnson, 463 F.3d 803, 807-08 (8th Cir. 2006).  Even if considered 404(b), the evidence is admissible as it goes to the defendant's intent, preparation, plan, knowledge, and the absence of mistake. See United States v. Edelmann, 458 F.3d 791, 810 (8th Cir. 2006) (evidence that defendant was convicted of filing false CTRs with the IRS was admissible to show intent in fraud charges).

   3.   Petters' Bank Fraud

   The government may also introduce evidence of a bank fraud perpetrated by Petters.  Specifically, Petters directed White to falsify his 2003 personal tax returns, which substantially inflated his purported income, to provide to banks so as to secure personal funds and credits.  In 2006, Petters was questioned by James Wemhoff regarding the falsified tax returns that had been submitted to a bank to secure a credit line for Petters personally.  Petters' immediate reaction was to blame Bob White for the fraud.  Notably, however, Petters took no action to correct the fraud.

   Again, the evidence is admissible as it goes to the defendant's intent, knowledge, and the absence of mistake, particularly as it relates to his knowledge and ratification of White's fraud on behalf of the defendant.  The evidence is also relevant to demonstrating the defendant's ready willingness to blame others.

D.   THE MESHBESHER DEFENSE

At the detention hearing on October 30, 2008, the defendant, after consultation with his current attorney, broadly waived privilege with respect to his attorney-client relationship with attorney Steven Meshbesher.   See Transcript dated Oct. 30, 2008. According to Mr. Meshbesher, the defense now used by defendant Petters – blaming someone else for a fraud while claiming he was too naive and trusting – was previously used by the defendant once before in Colorado.   See Jon Tevlin, "A Schemer's Plan: Snitch and Grow Rich," StarTribune (Set. 16, 2009).   (According to Petters, he hid out in Wisconsin until his attorney could strike a bargain with prosecutors.   See Gov't Ex. 353A.)

In addition, at the detention hearing, Meshbesher testified that, at the defendant's direction, he sealed and expunged records related to the defendant's criminal history so that "in the future when other individuals would try to gather information related to Mr. Petters and Petters' company, they would not discover this information."   See Transcript at 94 (Docket 99).   As such, particularly in response to defense claims regarding the sealing of documents, the government may call attorney Meshbesher to testify regarding the defendant's (i) prior use of his current defense, and (ii) the defendant's desire to seal records keeping investors from discovering his past.

III.  <u>MOTIONS IN LIMINE</u>

A.    <u>PURPORTED GOVERNMENT MISCONDUCT</u>

Throughout the proceedings, the defendant has made unfounded and unsubstantiated claims regarding purported government "perfidity" and misconduct.  All such claims have been rejected by the Court.  The defendant has demonstrated a plain intent to shift the trial from his own conduct onto the conduct of others, including the government.  With regard to the government, there is simply no relevance to any such claim.  It can only mislead and confuse, and should be precluded under Fed. R. Evid. 403.

B.    <u>THE WITNESS SECURITY PROGRAM WITNESS</u>

The government reserves the right to call a witness who has prior felony convictions from the 1970s and 1980s and who was, until pleading guilty in this case, a participant in the federal Witness Security Program (although the supervision ended in 1991). The potential witness has pleaded guilty.  The witness has no cooperation agreement with the government and is under no obligation to testify.  The government intends to serve the witness with a subpoena, and the witness may choose to testify. Presumably, the witness will voluntarily testify to put himself in the best light possible for sentencing.  The government has made the witness no promises other it will communicate to the sentencing court any assistance the witness provides.

As a result of the guilty plea, the witness was terminated from the Witness Security Program.  There is no offer, or intent to offer, readmission.

1.   The Defense Should Be Precluded From Inquiring Regarding Decades-old Convictions on Cross-Examination

The defendant has given notice that he intends to cross-examine the witness, if called, with criminal convictions that are from the 1970s and 1980s.  The defendant should be precluded from doing so.  Fed. R. Evid. 609(b).

2.   The Defense Should Be Precluded From Inquiring Regarding Participation in the Witness Security Program on Cross-Examination

The defendant has indicated an intent to cross-examine the witness, if called, regarding the witness's participation in the Witness Security Program.  Participation in the program is wholly irrelevant.  There is no witness bias in favor of the government. To the contrary, the government terminated the witness's participation.  The inquiry would be made to mislead and to confuse, and it should be precluded under Fed. R. Evid. 403.

3.   The Defendant Should Be Precluded From Introducing Witness Security Program Documents and Records

Even were the defendant permitted to inquire regarding the witness's prior participation in the Witness Security Program, the defendant should not be permitted to introduce Program documents, essentially making a mini-trial of something that is wholly irrelevant to the charges against the defendant.  Whether or not a

witness participated in the program is wholly collateral to the case.   As such, under Federal Rule of Evidence 608(b), the defendant should not be permitted to introduce extrinsic evidence of the collateral matter.   <u>United States v. Roulette</u>, 75 F.3d 418, 423 (8th Cir. 1996) (explaining that evidence that does not pertain "to the substantive issues of the trial" and that "could not be shown in evidence for any purpose independent of the contradiction" is collateral, and extrinsic evidence on collateral matters is inadmissible under Fed. R. Evid 608(b)); <u>United States v. Martz</u>, 964 F.2d 787, 789 (8th Cir. 1992) ("The purpose of barring extrinsic evidence is to avoid holding mini-trials on peripherally related or irrelevant matters.")

C.   <u>IMPROPER CHARACTER EVIDENCE</u>

Based on his exhibit list, the defendant appears to intend to introduce character evidence through the admission of certain awards and recognitions he has received.

Pursuant to Rules 402 and 404(a)(1) of the Federal Rules of Evidence, any such evidence should be limited to a pertinent trait or characteristic.   Moreover, pursuant to Rule 405(a), any such evidence should be limited to opinion or reputation testimony.   The defendant should be precluded from offering evidence of specific instances of conduct, including testimony or evidence of prior awards, or any other types of specific instance evidence.

If the defendant offers character evidence, the government may inquire with the witness regarding specific instances of conduct

28

that are contrary to the purported character trait or offer rebuttal evidence.

The defendant appears to intend to introduce evidence of his religious faith.  Such evidence is irrelevant and should be precluded under Fed. R. Evid. 403 and 404(a); see generally Fed. R. Evid. 610; United States v. Sampol, 636 F.2d 621 (D.C. Cir. 1980) (Fed.R.Evid. 610 prohibits eliciting evidence of religion for purpose of showing credibility).


Dated: October 14, 2009                Respectfully Submitted,

                                       B. TODD JONES
                                       United States Attorney

                                       s/ Joseph Dixon

                                       BY: JOSEPH T. DIXON, III
                                       Attorney ID No. 0283903
                                       JOHN R. MARTI
                                       TIMOTHY C. RANK
                                       Assistant U.S. Attorneys