UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 08-364(1) (RHK/AJB)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | GOVERNMENT'S POSITION |
| | ) | REGARDING SENTENCING |
| THOMAS JOSEPH PETTERS, | ) | |
| | ) | |
| Defendant. | ) | |

The United States, by and through its attorneys, B. Todd
Jones, United States Attorney for the District of Minnesota, and
Joseph T. Dixon III, John R. Marti, and Timothy C. Rank, Assistant
United States Attorneys, hereby submits this Position Regarding
Sentencing.

The defendant's fraud is staggering and unprecedented in size
and impact on victims and the community.  For over a decade, the
defendant readily and corruptly used corporate assets, wealth and
power entrusted to him by the investment community.  Throughout,
the defendant carefully crafted and manipulated his image as a
charitable and religious philanthropist to fool business, political
and religious leaders, who in turn lent credibility to the
defendant further facilitating and concealing the fraud.  Given the
nature and scope of the defendant's stunning criminality, the
defendant's long history of engaging in similar fraudulent conduct,
his contemptuous conduct at trial, and the unprecedented offense
level calculation and applicable sentencing guideline of life

imprisonment, the defendant has earned for himself a life sentence, which in this case gives rise to the maximum statutory sentence permitted by the counts of conviction (335 years).

A life sentence is wholly deserved and justified given the defendant's corrupting influence on individuals and institutions, and his strident refusal to accept any responsibility for the offense and his conduct.  Instead, the defendant blamed those around him with demonstrably false testimony and shamelessly and cynically exploited his son's tragic murder in a desperate attempt to avoid his personal responsibility, as he had done throughout his fifteen-year fraud.  Notwithstanding overwhelming evidence and the plainly evident impact on the victims of his fraud, the defendant attempted once again to "beat the system" and laugh, perhaps still clinging to his purported belief that "divine intervention" would save him from the havoc he had wrought on himself, his co-defendants, his victims, his employees, his businesses, his friends, his associates, and the community.

The defendant's fraud is beyond comprehension in size and scope.  The offense is the largest fraud in the history of Minnesota.  Indeed, there are only a handful of fraud schemes that are even comparable in the history of the United States.  On September 24, 2008 and the days that followed – when federal law enforcement brought a halt to the defendant's fraud – the defendant's fraudulent illusion of $3.5 Billion of wealth and

financial soundness collapsed.  The fraud, created and cultivated by the defendant and his "instruments of darkness," left in its wake a trail of devastation and economic skepticism.

The defendant's now notorious crime victimized not only his investors and the investment community but society at large.  A critical component of the defendant's fraud – one that he continues to assert to this day – is his carefully crafted persona as a captain of industry, a man of integrity, a charitable and religious philanthropist, and a leader and benefactor to our community who came to be trusted by business leaders, political leaders and religious leaders.  In other words, the image of a person who could be, and should be, entrusted with a position of power, leadership, and authority.  Yet, the defendant was a fraud perpetrated on our institutions and community.  His fraud, along with the few other current mega-frauds involving business leaders, threatens to undermine society's confidence and trust in the integrity of the investment community  that is essential for our economy to thrive.

The offense level for the defendant's conduct – a calculation that fairly and accurately represents the gravity and magnitude of the defendant's conduct – gives rise to a guideline sentence of life in prison, which calls for the statutory maximum sentence. And, while a sentence of 335 years may have little meaningful significance to the defendant, who is now 52 years old, the sentence imposed in this case will have broader significance to our

community.   Criminal abuse of power and wealth, such as that perpetrated in this case, must be met with the most significant punishment available.   To be sure, there will undoubtedly be other significant frauds in the future, involving millions of dollars, tens of millions of dollars, and even hundreds of millions of dollars.   Those defendants may, under certain circumstances, themselves warrant sentences of 10, 20, 30 years or more.   As such, because this sentence must be a term of years (rather than a life term), the sentence in this case must be sufficiently high that it cannot be used by future defendants, whose fraud may be substantial albeit a fraction of the defendant's, as an argument to limit the punishment they themselves deserve.

I.   <u>Sentencing Guidelines</u>

A.   <u>Offense Guideline Calculation: Life Imprisonment (335 Years)</u>

The Presentence Report ("PSI") properly and correctly apply numerous offense level adjustments under Section 2B1.1 and Chapter 3 of the United States Sentencing Guidelines, resulting in an offense level of 55.   In addition to the adjustments applied in the Presentence Report, the defendant's conduct merits a 2-level enhancement for the impact of the offense on vulnerable victims, pursuant to Section 3A1.1(b).[1]

_____

[1]The defendant has objected to many of the adjustments applied in the PSI.  In accordance with Local Rule 83.10(f), the government will file a separate motion for an evidentiary hearing for purposes of sentencing.  To the extent possible, the government intends to rely on the trial record to support the sentencing adjustments and

Accordingly, the Court should find the offense level to be 57, resulting an applicable guideline of life imprisonment, subject to the statutory maximum sentence allowable under the counts of conviction of 335 years imprisonment.

An offense level of 57 (or even 55) may be the highest offense level ever calculated in the history of the District of Minnesota. Notably, the sentencing table itself establishes an adjusted offense level of 43 as the top offense level, with an applicable guideline of life imprisonment regardless of the applicable criminal history. In this case, the extraordinary offense level calculation (whether 55 or 57) fairly and accurately reflects the true magnitude of the defendant's criminal conduct.

B.    The PSI's Applied Offense Adjustments Are Correct and Warranted

1.    Loss Calculation Adjustment

The PSI properly and correctly applies a 30-level upward adjustment pursuant to Section 2B1.1(b)(1)(P), because the losses exceed $400 million. The Guidelines adjustment for loss tops out at a 30-level enhancement for frauds resulting in losses over $400 million. There is no dispute in this case that the loss far exceeds that amount. In September 2008, Petters' entities owed

---

enhancements. The government will work with defense counsel to limit and to minimize the need for an evidentiary hearing. No later than seven days prior to sentencing, the government will provide the Court, defense counsel and the probation officer with a witness list and exhibit list of any additional evidence the government intends to present, if any.

investors over $3.7 billion.  (Def. Ex 200; Trial Tr. at 2735-37
(Defense Witness Tom Fisher).)   The lost principal (without
consideration of accrued interest) is in excess of $1.8 billion.
(PSI ¶ 87.)

The losses are staggering.  The government is aware of only
one other case in the history of the United States in which a
Presentence Report addressed a Ponzi scheme loss in excess of a
billion dollars, <u>United States v. Bernard L. Madoff</u>, where the
defendant was sentenced to a statutory maximum sentence (150 years
imprisonment) after confessing to law enforcement, quickly pleading
guilty, and taking full responsibility for the fraud and his
conduct.  Madoff's adjusted offense level was 52.

Moreover, for purposes of the Guideline calculation, the Court
calculates loss based only on the pecuniary harm that resulted from
the offense, both "monetary" harm as well as harm that "otherwise
is readily measurable in money," U.S.S.G. § 2B1.1, app. notes
3(A)(i), 3(A)(iii) & 3(c).  The loss calculation does not include
intangible losses and losses that are not otherwise sufficiently
concrete.  Notably, these harms - such as the reputational harm
suffered by victims and the individuals, institutions and
businesses associated with the defendant – may be, and should be,
considered in terms of an appropriate sentence pursuant to 18
U.S.C. § 3553(a).

2.   <u>The Number of Victims Exceeds 250</u>

The PSI properly and correctly applies a 6-level upward adjustment pursuant to Section 2B1.1(b)(2)(C), because the offense involved more than 250 victims.  As of the date of the report, the PSI had identified approximately 340 victims and correctly noted that the number would likely increase.  Among the victims are the defendant's long-time business partners and friends.  Indeed, as evidenced at trial, the defendant personally defrauded his purported best friend of $10 million in February 2008 and his long-time business partner of another $10 million in June 2008, all in an effort to keep his crumbling scheme afloat.  Indeed, the defendant's best friend mortgaged his personal residences to provide the defendant with funds borrowed from banks.

Although he ultimately suffered no loss (and is not counted among the victims), the evidence at trial also proved that the defendant defrauded his father-in-law of approximately $1.2 million in the fall of 2000  (<u>compare</u> Trial Tr. at 2509-11 (father-in-law's testimony) <u>with</u> Gov't Exs. 190 and 190A (showing father-in-law's funds used to pay GE Capital)), a time when the defendant was scrambling to repay GE Capital Corporation $38.5 million before they discovered the fraud.

As with any Ponzi scheme, the ultimate victims who suffer the financial impact are those who invest at the end.  Among these victims are at least 10 pastors, 3 missionaries and dozens of

retired, elderly individuals who invested their respective life savings based on the false promises made by the defendant and his scheme.   In addition, at least half-a-dozen nursing home victims have lost the funds they had saved to provide for their long-term care.   Churches, non-profit groups and family trusts are also among the victims.   These organizations have suffered the loss of funds needed for building projects and organizational emergencies as well as the provision for handicapped individuals.   (PSI ¶ 75.)

It has been widely reported that educational and religious institutions that received large donations from the defendant are properly returning the stolen money for the benefit of the victims. These institutions, which were unwittingly used by the defendant to enhance his contrived image as a charitable philanthropist, are also victimized by the fraud in that they are now called upon to return the donations they relied upon when making decisions to build facilities or programs (in many instances, named in honor of the defendant).

3.   Jeopardizing the Soundness of a Financial Institution

The PSI properly and correctly applies a 2-level upward adjustment pursuant to Section 2B1.1(b)(14)(ii),[2] because the offense jeopardized the safety and soundness of a financial institution, namely (i) a victim bank in Chicago that had extended

_____

[2]Although this adjustment would typically be a 4-level adjustment, the PSI correctly applies only a 2-level adjustment based on the application of the other adjustments.

a $50 million credit line to the Lancelot Funds and (ii) the Lancelot Funds which had invested approximately $1.5 billion in Petters Company, Inc.  The term "financial institution" includes investment companies.  U.S.S.G. § 2B1.1, app. note 1.  Applying the plain meaning of the Guidelines, courts have held that hedge funds, as investment companies, are financial institutions for purposes of Section 2B1.1.  See United States v. Harris, 490 F.3d 589, 595 (7th Cir. 2007); See also United States v. Savin, 349 F.3d 27, 37 (2d Cir. 2003) (interpreting 2F1.1).

In addition to the Lancelot Funds, at least one other hedge fund, Palm Beach Partners Finance LP, filed for bankruptcy on December 1, 2009 as a result of its investments in Petters Company, Inc.  See Dawn McCarty and Sophia Pearson, Palm Beach Finance Files Bankruptcy on Petters Loss (Dec. 1, 2009) (at www.bloomberg.com).

4.  Organizer Role Enhancement

The PSI properly and correctly applies a 4-level enhancement pursuant to Section 3B1.1(a), because the defendant was the "leader of a criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(a).

"In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered."  U.S.S.G. § 3B1.1, app. note 3.  "Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered

9

extensive." Id. And, if the criminal enterprise is determined to be otherwise extensive, "the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." Id., app. note 2.

> In assessing the enhancement, the Guidelines provide that:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Id., app. note 4 (emphasis added); see also United States v. Radtke, 415 F.3d 826, 845 (8th Cir. 2005) (pointing to Application Note 4 factors as method of applying organizer/leader enhancement).

From the outset of the trial, both parties acknowledged there were at least five participants in the fraud – Robert White, Deanna Coleman, Larry Reynolds, Michael Catain and later Greg Bell. The question at trial was who brought these "instruments of evil" together for their criminal purpose. The evidence adduced at trial answered that question beyond all doubt: it was Thomas Petters. Each of the participants was recruited into the PCI fraud by the defendant. The two main participants with the defendant, Deanna Coleman and Robert White, were the defendant's subordinate employees who relied on the defendant for their employment. Two other components, Larry Reynolds and Michael Catain, were also recruited by the defendant. (Trial Tr. dated Nov. 19 at 103-04

(defendant Petters: "I asked both of them to perform a service for us.").) Defendant Petters also admitted recruiting Reynolds to "play" an auditor for him. (Id. at 105.)

In addition to the consistent testimony from each of the participants, the testimony and documentary evidence also proved that Petters was not only the chief executive officer of PCI (the corporate engine of the fraud), investors saw the defendant as its "heart and soul." (Trial Tr. at 1882.)  Indeed, the defendant admitted he was its heart and soul.  (Trial Tr. dated Nov. 19, 2009 at 4.)  He also admitted taking PCI funds over the objections of Coleman, because he was PCI's president. (Id. at 12.) Jim Wemhoff testified the defendant was amazingly knowledgeable about what was going on in his companies and in control of PCI funds.  (Trial Tr. 1749-50; 1766-67.)  Moreover, the contemporaneous emails by the defendant make evident his efforts to maintain and control the fraud as its leader.  (See, e.g., Gov't Ex. 27A (Petters/Coleman emails); Gov't Ex. 14 (email from Petters to Coleman dated Apr. 1, 2006: "I am so sorry that I ever got you in this shit. . . . The decisions I make I do not try to keep from you."); Gov't Ex. 27Z (email from Petters to White dated May 16, 2006: "The answer is not NO but HELL NO!!!!!!!!! . . . I am now sitting on top of lots of responsibility to you, Deanna and 3,234 other people.")) When co-conspirators worried about what would happen, in an effort to maintain their commitment, the defendant assured them he would

figure a way out.  (See, e.g., Gov't Exs. 14; 27A, page 803; Trial Tr. 952-53 (Margolis:  Petters screamed at White and told White that White could not quit.))  To maintain their commitment and loyalty, the defendant also paid his team millions with stolen money.  (See, e.g., Gov't Ex. 101A, page 6 ($2 million to White) and page 11 ($1 million to Coleman).  As the leader of the scheme, the defendant rewarded himself with the lion's share of the fruits of the crime, taking hundreds of millions of dollars for himself and the companies he owned.  (See, e.g., Gov't Ex. 7A.)

In addition, Jim Wemhoff testified regarding the corrupt and criminal actions he took, late in his career, at the behest of the defendant.  (Trial Tr. at 1761; 1779.)  At the opposite end of the experience spectrum, Petters' young personal assistant David Margolis further corroborated and confirmed Petters' corrupt influence, and the lying and deceit Margolis undertook at the direction of the defendant.  (Trial Tr. at 938-45.)

Thomas Petters strived to be perceived as the man in charge. He was the man in charge.  Accordingly, he warrants a 4-level enhancement.

5.  Abuse of Trust

The PSI properly and correctly applies a 2-level enhancement pursuant to Section 3B1.3 for abuse of trust.

For the enhancement to be applicable, "the position of public or private trust must have contributed in some significant way to

facilitating the commission of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult)."  U.S.S.G. § 3B1.3, app. note 1.

The defendant was the owner and chief executive officer of Petters Company, Inc., and the chairman of Petters Group Worldwide LLC and other companies.  He purchased significant corporate assets such as Sun Country Airlines and Polaroid Corporation.  He publicly cultivated an image as a charitable philanthropist in the community with large, publicized donations to educational and religious institutions (using proceeds of the fraud).  He started a non-profit foundation.  All of these efforts were designed to enhance his stature within the community, and specifically the investment community, by gaining a position of public trust. All of these efforts were designed both to further and to conceal the fraud, impressing potential investors to provide the defendant and the scheme with discretion to direct and divert the billions of dollars that flowed through PCI's accounts.

In addition, the defendant purchased real corporate assets, such as Sun Country Airlines and Polaroid Corporation.  These corporations were real businesses with real employees and real creditors with respect to whom the defendant maintained a position of private trust.  Not only were these businesses used by the defendant to burnish his image as a corporate tycoon, the defendant, in his position as owner and chairman of the board,

caused these businesses to depend on the PCI fraud for operational funding, thereby putting these businesses and their employees at substantial risk once the fraud collapsed.  As a result, following the collapse on September 24, 2008, both Sun Country Airlines and the Polaroid Corporation quickly filed for bankruptcy resulting in lost jobs, reduced salaries and losses to the business creditors.

6.   Obstruction of Justice

The PSI properly and correctly applies a 2-level enhancement pursuant to Section 3C1.1 for obstruction of justice.  The enhancement is warranted based upon two separate grounds: (i) the defendant's efforts to persuade Robert White and Larry Reynolds to flee the country following the execution of a search warrant on September 24, 2008 and the defendant's notification of the criminal investigation, and (ii) the defendant's perjurious testimony before the Court at trial.

The enhancement applies where a defendant (i) "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice" and (ii) the obstructive conduct relates to the defendant's offense.  U.S.S.G. § 3C1.1.  Application Note 4 provides that the enhancement applies where a defendant seeks to conceal evidence that is material to an official investigation or judicial proceeding or procures another to do so.

As of September 24, 2008, following the execution of the search warrants and his interview by the FBI, the defendant was

14

personally aware of the criminal investigation into the fraud at
PCI.  Seven days later, on October 1, 2008, in a recorded telephone
call, Petters repeated his earlier suggestion to Robert White that
White flee the country much like Marc Rich had in the 1980s in an
effort to avoid prosecution.   (Gov't Ex. 353 & 353A.)

Even at trial, the defendant conceded that he wanted White to
flee so that White would not testify against the defendant, making
it easier for the defendant to blame White:

> Q:  The fact is you wanted him to flee so that he
> couldn't testify against you?
>
> A:   That is not correct.
>
> Q:  You didn't want him to walk into the Court and do
> exactly what he did?
>
> A:   No, you're right.  That is correct.
>
> Q:  And you didn't want him around so that it would be
> easier for you to blame him without him saying, "no, it
> wasn't just me."
>
> A:   No.  You know, that's, I guess hindsight looking
> forward what I looked at then is it was an incredible
> mess, and I didn't want him around.
>
> Q:  So you could blame him, just like you are doing now?
>
> A:   Yes, I am now.

(Trial Tr. dated Nov. 19, 2009 at 48.)

In addition to his obstructive efforts to get material
witnesses to flee the country, the defendant merits the 2-level
enhancement for his perjurious testimony at trial, specifically, he

expressly denied knowledge of, or knowing participation in, the fraud. (See, e.g., Trial Tr. dated Nov. 19, 2009 at 4.)

"Under U.S.S.G. § 3C1.1 a defendant is subject to a two level enhancement if he 'testifies falsely under oath in regard to a material matter and does so willfully rather than out of confusion or mistake.'" United States v. Rehak, 589 F.3d 965, 975 (8th Cir. 2009) (quoting United States v. Mendoza-Gonzalez, 363 F.3d 788, 796 (8th Cir. 2004)). "In order to base an obstruction of justice enhancement on a defendant's trial testimony, the district court must find by a preponderance of the evidence that he perjured himself." United States v. Lewis, 436 F.3d 939, 945 (8th Cir. 2006). "A district court applying the obstruction-of-justice enhancement for perjury must review the evidence and make an independent finding, by a preponderance of the evidence, that the defendant gave false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Ziesman, 409 F.3d 941, 956 (8th Cir. 2005) (citations omitted).

The defendant's testimony was patently false and was flatly contradicted by the mountain of evidence adduced at trial. The recordings of the defendant discussing his participation in the fraud (e.g., Gov't Exs. 9-12), the emails of the defendant admitting his knowledge and participation in the fraud (e.g., Gov't Exs. 14, 27A, 27Z), and the direct, indirect, and circumstantial

16

evidence proved beyond all doubt the defendant knew of, participated in, directed, and benefitted from the fraud. Prior to trial, the government provided the Court with Government Exhibit 365, a recording of the defendant dated October 11, 2008 in which he contemplated negotiating a plea deal and admitted to his daughter that he had known of the problems for years. This October 2008 conversation makes plain that his perjurious testimony at trial was a calculated decision to risk the odds (and the potential consequences) in the hope of avoiding all responsibility. In addition, during his testimony he falsely claimed he did not know Larry Reynolds had any prior involvement with the Witness Security Program until 2009. (Trial Tr. at 145.) Following the defendant's testimony, the government provided the Court with a recording establishing that on October 23, 2008 the defendant encouraged his girlfriend to tell a member of the press that Reynolds was in the Witness Security Program.

C.   Additional Applicable Enhancements

Although not included in the PSI, the defendant's conduct in this case warrants application of a 2-level enhancement pursuant to Section 3A1.1(b), because the defendant knew and should have known that a victim of the offense was vulnerable. U.S.S.G. § 3A1.1(b).[3]

---

[3]The additional 2-level enhancement for offenses involving a large number of vulnerable victims pursuant to Section 3A1.1(b)(2) is not applicable because of the application of the 6-level enhancement under Section 2B1.1(b)(2)(C). U.S.S.G. § 2B1.1, app. note 4(D).

A "vulnerable victim" is someone who is a victim of the offense and is "unusually vulnerable due to age, physical or mental conduction or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, app. note 2. The Court heard testimony from Janet Leck, a retired widow who was living on Social Security benefits when she mortgaged her home to invest in Petters Company, Inc. through Frank Vennes in 2006 or 2007. (Trial Tr. at 1948.) As a consequence of the fraud, Ms. Leck was facing foreclosure on her home of more than 30 years. (Trial Tr. at 1950.) In addition, the Court also heard from Ray Ross, a man who retired in 1990 from his position as a machine operator because of a neuromuscular disease, who invested his retirement funds and proceeds of the sale of his home in Petters based on the Petters' persona Mr. Ross read about in magazines. (Trial Tr. at 2226-33.) As a result of the fraud, Mr. Ross has nothing other than Social Security benefit to survive. (Trial Tr. at 2234.) The testimony of these victims establishes them as "vulnerable victims" as the term is used in Section 3A1.1. See United States v. Anderson, 440 F.3d 1013, 1017-18 (8th Cir. 2006)(affirming application of the enhancement based on testimony of the victim's age, job experience and lack of investment sophistication). The PSI also indicates that other victims include nursing home residents and handicapped individuals. (PSI ¶ 75.)

In Government Exhibit 377, Petters' knowledge of the vulnerability of at least some of his investors was made plain when he laughingly told Coleman that investors through Frank Vennes included "little old ladies" and unaccredited investors (i.e., unsophisticated investors).  (See Gov't Ex. 377 & 377A.)

The PSI indicates that the enhancement was not applied because there was no evidence that the defendant "sought out" vulnerable victims.  See PSI at A.1 (asserting that had the defendant sought out the vulnerable victims, the enhancement would have applied).  This is an erroneous interpretation of the Guideline.  This interpretation has been rejected by the Sentencing Commission and the Eighth Circuit Court of Appeals, which require only that the defendant knew one of his victims was vulnerable.  In fact, in 1995, the Sentencing Commission eliminated the commentary to Section 3A1.1 that was understood by some courts to impose a "targeting requirement."  See United States v. Anderson, 349 F.3d 568, 572 (8th Cir. 2003) (citing Amendment 521 and affirming the absence of such a requirement).

Accordingly, the 2-level enhancement under Section 3A1.1 applies, and the proper adjusted offense level is 57.

D.   Criminal History Calculation

The PSI properly calculates the defendant's criminal history as Category I.  Nevertheless, a careful review of the defendant's history reveals a trail of similar criminal conduct that went

19

unaddressed, in part because of the defendant's ability to blame others and to conceal that prior conduct. Indeed, at trial, the defendant admitted that in 1989 in Colorado – before he knew the co-defendants – he received $75,000 to purchase merchandise but which funds were used for other purposes. (Trial Tr. dated Nov. 19, 2009 at 116). At the time, the defendant blamed his partners. (Id.) The defendant agreed to make restitution, allowing himself to escape a criminal conviction.

In addition, the evidence at trial demonstrated that the defendant's criminality was not limited to the fraud at issue, but also included bank fraud and egregious and shameless tax evasion.

Given this history, as well as the duration of this offense, and the defendant's utter refusal to accept responsibility for his conduct, his criminal history category substantially understates the likelihood that the defendant will commit other crimes if released from custody. Indeed, in light of his performance at trial, it is evident that the defendant will commit further fraud if permitted. He knows no other way.

II.  Sentencing Considerations

In addition to the guidelines, the Court must consider the factors set forth in 18 U.S.C. § 3553(a). For the reasons set forth above, the life sentence requested by the government is consistent with the statutory goals of sentencing, which include "the nature and circumstances of the offense and the history and

characteristics of the defendant;" "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . .."

As noted above, the defendant initiated and led a mega-fraud of unprecedented proportions in this district.  Moreover, in sharp contrast to his co-defendants, the defendant is wholly unrepentant for his criminality.  The defendant reaped the lion's share of the fruits of the fraud.  He must now bear the consequences of his choices.

The defendant deserves a life sentence to punish him for the criminal lifestyle he embraced for most of his adult life, his betrayal of the calculated fraudulent persona the defendant created as a business leader and religious philanthropist, and his refusal to accept any responsibility for his conduct.

Moreover, beyond punishing the defendant, the community requires a sentence that makes plain to those entrusted with power, our society's assets, and investors' money that criminal abuse of

that power and trust will be met with the most serious punishments available.

III. <u>Conclusion</u>

Based upon the staggering and unprecedented size and impact of the offense on the victims and the community, the calculated perversion of the corporate assets, wealth and power entrusted to the defendant by society and the investment community, the defendant's betrayal of the carefully crafted image of a charitable and religious philanthropist, the defendant's long history of engaging in this fraud and other criminal conduct, his cynical and contemptuous conduct at trial and refusal to accept any responsibility for his conduct, and the unprecedented offense level calculation and life imprisonment guideline, the government respectfully requests that the Court impose a life sentence which in this case gives rise to the maximum statutory sentence allowable under the offenses of conviction, 335 years.

Simply put, the defendant has earned for himself the maximum sentence allowable, and it is entirely warranted and justified.

Dated: March 8, 2010                    Respectfully Submitted,

                                        B. TODD JONES
                                        United States Attorney

                                        s/ Joseph T Dixon III

                                        BY: JOSEPH T. DIXON III
                                        Attorney ID No. 0283903
                                        JOHN R. MARTI
                                        TIMOTHY C. RANK
                                        Assistant U.S. Attorneys