# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

Plaintiff,

Crim. No. 08-364 (RHK)
Civ. No. 13-1110 (RHK)
**MEMORANDUM OPINION
AND ORDER**

v.

Thomas Joseph Petters,

Defendant.

---

John R. Marti, Acting United States Attorney, Timothy C. Rank, Assistant United States Attorney, Minneapolis, Minnesota, for the Government.

Steven J. Meshbesher, Kevin M. Gregorius, Adam T. Johnson, Meshbesher & Associates, PA, Minneapolis, Minnesota, for Defendant.

---

In 2009, following a four-week trial and a week of deliberations, a jury convicted Defendant Thomas Joseph Petters of 20 counts of fraud, conspiracy, and money laundering, concluding he had spearheaded a massive Ponzi scheme for nearly two decades. This Court later sentenced him to 50 years' imprisonment. He appealed, and the Eighth Circuit affirmed both his conviction and sentence; his subsequent petition for a writ of *certiorari* was denied by the United States Supreme Court.

Staring into an abyss of nearly 15,000 days of incarceration, Petters has tried to pull off one final con. He now seeks relief from this Court under 28 U.S.C. § 2255, arguing that his trial lawyers – all three of them – failed to inform him of an alleged

Government plea offer that would have capped his sentence at 30 years. His Motion has been fully briefed, the Court held an evidentiary hearing on October 23, 2013, at which Petters testified, and the parties have now submitted post-hearing memoranda. The following constitutes the Court's findings of fact and conclusions of law and explains why the Motion will be denied.

## BACKGROUND

The factual background underlying Petters's crimes is only marginally relevant and need not be repeated in detail here. See United States v. Petters, 663 F.3d 375 (8th Cir. 2011). Suffice it to say, law-enforcement officers executed search warrants at his businesses on September 24, 2008, after an insider went to the FBI to report that he was running a multi-billion-dollar Ponzi scheme. Approximately one week later, Petters was charged by criminal complaint with fraud and related crimes and arrested. The complaint alleged that billions of dollars had been lost in the scheme; accordingly, the United States Sentencing Guidelines suggested a very substantial sentence, possibly including life imprisonment, if Petters were convicted of the crimes charged.

Petters retained counsel quickly following execution of the search warrants, employing the services of attorney Jon Hopeman, a seasoned criminal-defense lawyer who spent more than a decade as an Assistant United States Attorney in this District. Hopeman was assisted initially by a partner at his firm, Eric Riensche, and later by attorney Paul Engh, another highly experienced criminal defense lawyer in the Twin Cities.

On October 5, 2008, Assistant United States Attorney John Marti spoke with Hopeman by telephone to discuss the case. It is undisputed that during their conversation, Marti informed Hopeman the Government was willing to agree to a sentence capped at 30 years if Petters would plead guilty to some unspecified charges. This (so-called) offer was never reduced to writing, nor was there any discussion regarding the factual basis for a guilty plea. Marti later reiterated the proposed 30-year sentencing cap at a face-to-face meeting with Hopeman on December 17, 2008, approximately two weeks after Petters was indicted, and at other times before trial commenced in October 2009.

It is this alleged "offer" that lies at the heart of the instant Motion. According to Petters, "[a]t no time during the pretrial, trial, presentencing or sentencing stages of my case did Mr. Hopeman communicate the Government's offer to me." (Petters Aff. (Doc. No. 579-6) ¶ 3.) And he contends that had he known of the offer, he would have accepted it and pleaded guilty. (Id. ¶ 4.) Of course, he did not do so, and he mounted a spirited defense at trial, including taking the witness stand and repeatedly denying he was aware of any fraud being committed. The jury ultimately did not agree and convicted him of all 20 counts with which he was charged.

Petters now contends that his lawyers' failure to communicate the Government's 30-year sentencing cap constituted ineffective assistance of counsel, entitling him to relief from the 50-year sentence imposed by the Court.[1]

---

[1] Petters only seeks relief from his *sentence*; indeed, as discussed in more detail below, he must acknowledge his guilt in order to be successful here.

## STANDARD OF DECISION

In order to obtain relief under 28 U.S.C. § 2255, a federal prisoner must show that his "sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." A motion under § 2255 "may not do service for an appeal." United States v. Frady, 456 U.S. 152, 165 (1982). Rather, relief "is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice." United States v. Apfel, 97 F.3d 1074, 1076 (8th Cir. 1996).

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to effective assistance of counsel, e.g., Chesney v. United States, 367 F.3d 1055, 1058 (8th Cir. 2004), and generally speaking, allegations that trial counsel were ineffective fall within the "narrow range" of matters that may be raised in a § 2255 proceeding. See, e.g., United States v. McAdory, 501 F.3d 868, 872 (8th Cir. 2007). Such claims are governed by the two-part test enunciated in Strickland v. Washington, 466 U.S. 668 (1984), under which a defendant must show (1) his attorney's performance was deficient and (2) the deficiency prejudiced him. Id. at 687. As for the first prong, a defendant can show deficient performance only if his counsel's conduct "fell below an objective standard of reasonableness." Id. at 688. As for the second prong, a defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." Id. at 694.  The defendant bears the burden of proof on each issue.  Id. at 687.

The right to effective assistance of counsel extends to plea negotiations, see, e.g., Hill v. Lockhart, 474 U.S. 52, 57 (1985), and requires counsel "to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused."  Missouri v. Frye, __ U.S. __, 132 S. Ct. 1399, 1408-09 (2012) (citations omitted).  The failure to communicate a formal plea offer before it expires satisfies Strickland's "deficient performance" prong.  Id. at 1409.  But Strickland also requires prejudice, and "[t]o show prejudice from ineffective assistance of counsel where a plea offer has lapsed  . . . , [a] defendant[] must demonstrate a reasonable probability [he] would have accepted the earlier plea offer."  Id.

## ANALYSIS

Petters's argument rests upon three legs:  (1) the Government extended him a formal plea offer; (2) defense counsel failed to communicate that offer before trial; and (3) he was prejudiced because he would have accepted the offer and pleaded guilty, thereby receiving (at most) a 30-year sentence.  All three legs of Petters's argument must pass muster in order for him to be entitled to relief, yet for the reasons that follow, *none* has merit.

## I.    There was no formal plea offer

In Frye, the Supreme Court cautioned that allegations of uncommunicated plea offers are easily fabricated after-the-fact.  132 S. Ct. at 1408-09.  The Court emphasized, therefore, that ineffective assistance may arise only when *formal* plea offers have not

been communicated to defendants.  "[T]he fact of a formal offer means that its terms and its processing can be documented so that what took place in the negotiation process becomes more clear if some later inquiry turns on the conduct of earlier pretrial negotiations."  Id. at 1409.

Here, there was no written offer from the Government, but rather only oral communications between counsel.  While no hard-and-fast rule exists, Frye made clear that the presence of a writing is a crucial fact when determining whether a formal plea offer has been tendered by the Government.  See also, e.g., Davidson v. United States, No. 4:11CV1370, 2013 WL 1946206, at *5 (E.D. Mo. May 9, 2013) (finding no formal plea offer "in light of the absence of any documentation of this alleged deal").

Moreover, the only "term" of the so-called "offer" was a 30-year sentencing cap. There was no discussion of the charges to which Petters would plead guilty,[2] no discussion of the factual basis for such a guilty plea, and no discussion of the amount of restitution to be ordered or which of Petters's assets would be subject to forfeiture – often contentious subjects in fraud cases.  Simply put, there was no discussion of a myriad of issues typically part of plea agreements.

The Supreme Court has recognized that plea agreements "are essentially contracts."  Puckett v. United States, 556 U.S. 129, 137 (2009).  And in order for a contractual offer to exist, it must contain "sufficiently definite terms to enable [a] fact-finder to interpret and apply them."  Neb. Beef, Ltd. v. Wells Fargo Bus. Credit, Inc., 470

---

[2] Indeed, at the time the putative "offer" was first communicated, Petters had not yet been indicted.

F.3d 1249, 1251 (8th Cir. 2006). In the absence of any discussion of the charges to which Petters would acknowledge guilt, the factual basis for a plea, or restitution or forfeiture issues, the terms here were not sufficiently definite to constitute a "formal plea offer." See, e.g., Merzbacher v. Shearin, 706 F.3d 356, 369-70 (4th Cir. 2013) (where prosecution's offer "finalized only one leg of a putative plea agreement, the length of sentence[,] and did not finalize the other legs," no formal plea offer was made; reversing grant of habeas relief for ineffective assistance due to failure to communicate offer); Fanaro v. Pineda, No. 2:10-CV-1002, 2013 WL 6175620, at *5, 12 (S.D. Ohio Nov. 22, 2013) (Report & Recommendation of King, M.J.) (no formal plea offer from "very general" telephone conversation in which prosecutor offered four-year sentence and restitution in exchange for guilty plea, as the "offer was never reduced to writing and the parties never discussed which, if any, of the charges pending against Petitioner would be dismissed should Petitioner plead guilty and agree to a sentence of four years' imprisonment and an order of restitution in some unspecified amount"); United States v. Waters, Civ. A. No. 13-115, 2013 WL 3949092, at *8 (E.D. Pa. July 31, 2013) ("While we have been unable to find any authority defining the requisite elements of a formal plea offer, it is clear that an oral discussion of the sentencing range for a possible plea agreement that does not include an agreement on the charges to which the defendant will plead guilty and the facts that he will admit, does not constitute a formal plea offer.").

Petters directs the Court's attention to two cases in an attempt to show the Government tendered a formal plea offer here. Neither is persuasive.

He first cites <u>Wanatee v. Ault</u>, 101 F. Supp. 2d 1189 (N.D. Iowa 2000).  (Def.

Reply Mem. (Doc. No. 597) at 8-10.)  There, the court did, in fact, find that an oral offer

allowing the defendant to plead guilty to a lesser charge was a "formal plea offer."  But

<u>Wanatee</u> is distinguishable from the circumstances here for two key reasons.  First, unlike

in this case, the specific charge to which the defendant would plead guilty (second-degree

murder) *was agreed to by counsel*.  101 F. Supp. 2d at 1202.  As noted above, "agreement

on the charges to which the defendant will plead guilty" is a key factor when determining

whether a "formal plea offer" was made.  <u>Waters</u>, 2013 WL 3949092, at *8.  Second, and

more importantly, the prosecution in <u>Wanatee</u> implicitly *conceded* that a formal plea

offer had been extended to the defendant.  101 F. Supp. 2d at 1202 (noting the

prosecution had nowhere "object[ed] to the *existence* of a plea offer") (emphasis in

original).  Obviously, that is not true here.

The second case Petters cites is <u>United States v. Strother</u>, 509 F. App'x 571 (8th

Cir. 2013) (*per curiam*).  (Def. Post-Hr'g Mem. (Doc. No. 626) at 2.)  There, the

Assistant United States Attorney (AUSA) and defense counsel had "occasionally

discussed whether Strother would plead guilty," and in response to a request, the AUSA

e-mailed defense counsel his estimate of Strother's sentencing guidelines if Strother

pleaded guilty.  509 F. App'x at 573.  Strother later proceeded to trial and was convicted;

he then sought habeas relief, arguing his attorney had failed to communicate the AUSA's

"offer" to him.  The district court rejected that assertion after concluding that the "offer"

was, in fact, made known to him, and the Eighth Circuit affirmed.  According to Petters,

however, the Eighth Circuit "seem[s] to have accepted that the Government's cursory e-mail constituted a formal offer." (Def. Post-Hr'g Mem. (Doc. No. 626) at 2.)

Petters is wrong. Strother was based entirely on the fact that the AUSA's e-mail *had been disclosed to the defendant*. The Eighth Circuit *expressly declined* to decide whether the e-mail was, in fact, a "formal plea offer" under Frye. 509 F. App'x at 575 n.2 ("We assume without deciding that the . . . e-mail constituted a formal plea offer.").

## II. The alleged "offer" was communicated to Petters

Even if the Government's proposal of a 30-year sentencing cap constituted a "formal plea offer," the evidence conclusively establishes that counsel repeatedly informed Petters of the Government's proposal.

At the outset, it is noteworthy that the primary evidentiary support for Petters's claim is his own self-serving testimony. But in the Court's view that testimony is entitled to no weight; for the reasons that follow, the Court concludes that Petters is simply lying in a desperate attempt to save his own skin. The Court is not so easily fooled.

As noted above, Petters first averred, in an Affidavit filed with his Motion, that "at no time during the pretrial, trial, presentencing or sentencing stages of my case did Mr. Hopeman communicate the Government's offer to me." (Petters Aff. (Doc. No. 579-6) ¶ 3.) He claimed, instead, that he found out about the (alleged) offer only "during the pendency of [his] direct appeal." (Id. ¶ 2.) Yet, he contradicted himself in an Affidavit filed with his Reply Memorandum, barely two months later, in which he averred that he was "made aware of [the] offer . . . of a 30-year cap . . . *immediately following [his] trial and conviction*." (Petters Aff. (Doc. No. 597-5) ¶ 3 (emphasis added); see also id. ("After

the verdict was read and entered, I was taken to a holding cell by the U.S. Marshalls [*sic*]. Mr. Hopeman came to visit me in the holding cell and stated, 'Well, we had to go to trial [as] we could only get you a 30-year minimum deal.'".)  This contradiction provides reason enough for the Court to conclude Petters is dissembling, but the record contains far more to bolster that conclusion.

Most compelling are the consistent, forceful assertions of all of Petters's attorneys that they repeatedly communicated the proposed 30-year cap to him:

- "Between October and December 2008, even though Mr. Petters was in custody, the FBI and the IRS brought Mr. Petters to the U.S. Attorney's Office numerous times for meetings with my partner Eric Riensche and me. . . . I repeatedly discussed the government's proposed 30-year cap of imprisonment with Mr. Petters during these meetings."  (Hopeman Decl. (Doc. No. 591-1) ¶ 20.)

- "On October 27, 2008, I met with Mr. Petters and Mr. Riensche, in a private meeting at the U.S. Attorney's Office. . . . We discussed the government's proposal of a 30-year cap with Mr. Petters at [that] meeting."  (Id. ¶ 22.)

-  "I repeatedly discussed the government's proposed 30-year cap of imprisonment with Mr. Petters."  (Id. ¶ 43.)

- "Mr. Engh and I informed Mr. Petters that the government's only proposal remained a cap of 30 years in prison in exchange for a guilty plea and that the government was not interested in his cooperation."  (Id. ¶ 62.)

- "We conveyed this 30-year proposal to Mr. Petters.  He rejected it again." (Id. ¶ 74.)

- "I had two telephone conversations with Mr. Petters on October 18, 2009, two telephone conversations with Mr. Petters on October 19, 2009, and three telephone conversations with Mr. Petters on October 20, 2009. . . . I am sure that during most of these telephone conversations with Mr. Petters, I discussed the . . . 30-year proposal that the government persisted in making."  (Id. ¶ 75.)

- "I specifically discussed [at an August 19, 2009, meeting] the status of the plea negotiations with Mr. Petters, including, but not limited to, how the government would not come off the thirty-year cap." (Engh Decl. (Doc. No. 591-2) ¶ 4; see also id. ¶ 3 (adopting Hopeman's assertions above).)

- "There is no question what the Government's offer was, and no question that Mr. Hopeman and I provided it to Mr. Petters on numerous occasions (both together and alone), and no question he rejected it." (Id. ¶ 8.)

- "[T]he core allegation of the § 2255 motion – i.e., that Mr. Hopeman failed to communicate the government's proposed 30-year cap of imprisonment to Mr. Petters – is not accurate. Mr. Hopeman did, in fact, communicate this to Mr. Petters beginning in early October 2008, and continuing afterwards to trial. This was my recollection when I first learned of the theory propounded in the § 2255 Motion – even without having the benefit of reviewing any notes or records at all. My initial recollection has been confirmed after having reviewed certain of my own notes, as well as . . . exhibits from the defense file [], all of which refreshed my recollection." (Riensche Decl. (Doc. No. 591-3) ¶ 5.)

- "[T]he Hopeman Declaration accord[s] with my recollection of events relating to the potential plea agreement in October, November, and December of 2008. That is, Mr. Hopeman communicated the Plea Offer to Mr. Petters during this time." (Id. ¶ 6.)

Each attorney testified consistently at the evidentiary hearing, and the Court was able to observe their demeanor and appearance in the courtroom. The Court finds their testimony was both sincere and credible. It is also corroborated by the copious notes and memoranda prepared by Hopeman. (See, e.g., Hopeman Decl. (Doc. No. 591-1) ¶ 44 & Ex. 15 (agenda for 12/12/08 meeting with Petters included "Conv. w. John Marti" and "Plea agreement"); id. ¶ 52 & Ex. 18 (describing 7/6/09 meeting with Petters: "discussion with Marti regarding potential plea deal discussed").)[3]

---

[3] True, as Petters pointed out at the hearing, Hopeman's detailed notes nowhere *expressly state* that the Government's proposed 30-year cap was communicated to him. (See 10/23/13 Hr'g Tr. at 206-07.) But as the old saying goes, context is everything, and in the Court's view Hopeman's

More importantly, as Hopeman noted in his Declaration, there simply would have been no "ethical, legal, tactical, or practical reason not to communicate" the Government's alleged "offer" to Petters. (Id. ¶ 87.) Nor is there any obvious (or rational) reason for Hopeman to have lied in the contemporaneous notes he prepared of his meetings with Petters. And it would strain logic to the extreme to conclude that well-versed criminal defense lawyers would ignore their long-established ethical obligations and keep Petters out of the loop. See, e.g., Minn. R. Prof'l Conduct 1.4, cmt. 2 ("[A] lawyer who receives from opposing counsel . . . a proffered plea bargain in a criminal case must promptly inform the client of its substance.").[4]

Petters, of course, testified at the evidentiary hearing, and the Court had the opportunity to observe his demeanor and appearance in the courtroom also. Though not captured on the written transcript, Petters's testimony was, in the Court's view, deliberate, measured, and calculated. He seemed to be a man putting on a show, willing to say or do anything – including shedding crocodile tears – to obtain a reduction of the lengthy sentence imposed by this Court. He was also fidgety, cagey, and evasive, with his testimony frequently punctuated by lengthy pauses – again not captured in the

---

notes make quite clear that he did, in fact, convey the Government's "offer" to Petters. This is evident from the notes' frequent references to Petters imploring his lawyers to obtain a *better* deal from the Government (in the range of 5-20 years' imprisonment) before he would plead guilty. (See, e.g., Hopeman Decl. (Doc. No. 591-1) ¶¶ 24, 26-28, 31, 33-34, 49, 52, 54, 59-62, 64-66, 71-72 & Exs. 3-5, 7-8, 17-19, 21, 24.)

[4] Petters intimates that Hopeman did not communicate the Government's "offer" because of "personal pride," citing a January 30, 2009 memorandum drafted by Hopeman. (Def. Mem. (Doc. No. 579) at 2.) But Petters contorts the memorandum's text – Hopeman wrote that he would not "*advise* Mr. Petters *to plead guilty* to a 30 year cap," not that he would not (or did not) *inform* Petters of the cap. (Doc. No. 579-4 (emphases added).)

transcript – during which he appeared to be trying to conceive answers most helpful to his cause. In fact, at one point he engineered a complete about-face, going from acknowledging his guilt for the underlying fraud to denying that he intended to defraud anyone. (See 10/23/13 Hr'g Tr. at 36 ("Q. Now, you admit today that you're guilty of orchestrating really an enormous fraud scheme, correct? A. Yes."); id. at 74 (Petters: "And I would tell you today that I most definitely did not intend to defraud anybody. . . . Did I intend to defraud anybody? No, I did not.").) However, when counsel for the Government made clear that Petters could not obtain relief here without acknowledging his guilt, he reversed course again, admitting that he did, in fact, act with intent to defraud. (Id. at 76 ("Q. Did you intend to defraud your investors? A. Yes.").)

The foregoing covers mere snippets of Petters's time on the witness stand, but it undergirds an inescapable truth: his testimony is unworthy of any credence. In the Court's view, there is simply no reason to believe his claim that his lawyers never informed him of the Government's proposed 30-year sentencing cap before trial. Indeed, the *only* believable portions of his testimony at the hearing were his admissions that he is guilty of the crimes for which he was convicted, lied to thousands of people over more than a decade while orchestrating a massive Ponzi scheme, and then lied repeatedly to this Court at trial while under oath – in the clear hope of avoiding his just desserts.

Besides his own testimony, Petters attempts to buttress his claim with two additional pieces of evidence. Neither aids his cause, however.

The first is a statement contained in a memorandum drafted by Hopeman in January 2009. There, Hopeman described a meeting with Petters on December 10, 2008,

at which he informed Petters "that we had received no plea offer from the government,

despite the fact that some weeks ago, after [a] November proffer session, John Marti told

me that he would be making an offer." (Doc. No. 579-3.) Petters argues this clearly

shows Hopeman never mentioned the 30-year cap, but he asks the Court to cross a bridge

too far by taking this statement out of context, ignoring the clause "after [a] November

proffer session." In the Court's view, the only fair reading of this statement is that

following a November meeting with the Government, Hopeman had expected, but had

not received, a *better* offer than the 30-year cap the Government had already suggested.

(See Hopeman Decl. (Doc. No. 591-1) ¶ 43 ("I repeatedly discussed the [G]overnment's

proposed 30-year cap of imprisonment with Mr. Petters [and] then tried to get a better

deal from the [G]overnment in November 2008. I was unsuccessful; even though I

understood [the Government] would be providing us with another plea offer after the

November 2008 meeting, [it] never did make such an offer. Thus, on December 10,

2008, I informed Mr. Petters that we had received no plea offer from the [G]overnment

despite the fact that . . . I believed [it] would be making a proposal to us that included a

cap of imprisonment less than the[] already-proposed 30-year cap."); see also 10/23/13

Hr'g Tr. at 150-53, 163-64, 168-72, 178-82 (testifying to the same effect at the

evidentiary hearing).) This is consistent with the references in Hopeman's notes that

Petters wanted him to obtain a deal from the Government for 5-20 years in prison. (See

also Def. Reply Mem. (Doc. No. 597) at 11 (noting that Petters "specifically told trial

counsel he would plead guilty in exchange for a 5-20 year sentence").)

The second piece of evidence is an Affidavit from Shauna Kieffer, a young attorney who took interest in Petters's case shortly after being introduced to his brother through a coworker. According to her Affidavit, Kieffer had lunch with Hopeman in June 2012, nearly three years after Petters's trial, at which time he informed her "something to the effect of '30 years wasn't really an offer,'" so he "did not communicate it to [] Petters." (Kieffer Aff. (Doc. No. 579-5) ¶ 4.)

Suffice it to say, Kieffer's testimony at the hearing scuttles Petters's reliance on this statement. Kieffer testified, credibly in the Court's view, that she had misunderstood what Hopeman had told her: upon reviewing his files, it became clear to her that what he meant was "yes, he met with John Marti; and, yes, he thought the 30-year offer was ridiculous; and that he wouldn't tell [Petters] to *plea* to that offer. But [he did not] say that he didn't *communicate* that offer." (10/23/13 Hr'g Tr. at 137 (emphases added).)

For all of these reasons, the Court rejects Petters's claim that he was not informed of the Government's "offer" until after his trial had concluded.

## III. Petters would not have accepted

Even assuming *arguendo* the proposed 30-year sentencing cap had been a "formal plea offer" *and* that it was not communicated, Petters still would not be entitled to relief. And this is because he cannot show "prejudice" under <u>Strickland</u>, as he has failed to "demonstrate a reasonable probability [he] would have accepted the . . . offer" and pleaded guilty. <u>Frye</u>, 132 S. Ct. at 1409. Indeed, this final "leg" of Petters's argument is perhaps the most problematic for him, because he has repeatedly attempted to avoid ownership of the massive fraud he spearheaded.

Before the Court may accept a guilty plea from a defendant, it must find there exists a factual basis for the plea. See Fed. R. Crim. P. 11(b)(3). Here, that would have required Petters to acknowledge that he acted with intent to defraud and/or conspired with others to do so. But Petters maintained his innocence through trial and testified at length before the jury that he was completely unaware of the fraud taking place around him. He continued pressing this claim long after he was convicted, including in media interviews from prison in 2012 in which he forcefully denied knowingly defrauding anyone. (See Doc. No. 591-5 through 591-7.) As set forth above, Petters even attempted to evade responsibility at the evidentiary hearing, asserting that he would "tell you today that [he] most definitely did not intend to defraud anybody." (10/23/13 Hr'g Tr. at 74.) Only after the Government made clear that he could not obtain relief without acknowledging his guilt did he finally change his tune. Hence, the Court simply does not believe he would have been ready, willing, or able to stand up in open court in 2009 and acknowledge for all the world his responsibility for the fraud with which he was charged. (See also Def. Post-Hr'g Mem. (Doc. No. 626) at 6 ("conced[ing]" that Petters "often expressed reticence about the possibility of pleading guilty").) As the Eighth Circuit has stated, a "defendant who maintains his innocence at all the stages of his criminal prosecution and shows no indication that he would be willing to admit his guilt undermines his later § 2255 claim that he would have pleaded guilty if only he had received better advice from his lawyer." Sanders v. United States, 341 F.3d 720, 723 (8th Cir. 2003).

Hopeman's notes paint the same picture. Though they show a man vacillating between defiance and resignation, they repeatedly indicate that Petters would not accept responsibility for his crimes. This is perhaps best summarized in a single paragraph in Hopeman's Declaration:

> For most of the time I represented Mr. Petters, he had little to no interest in pleading guilty to any crime. However, there were interludes when he expressed some interest in reaching an agreement with the government with respect to his criminal case. I note that even during these interludes, however, Mr. Petters never admitted any "guilt" to me in the traditional sense of the word, that is, he never admitted to committing conduct that constituted a crime. Instead, Mr. Petters' view of "guilt," as I understood him, related, at most, to his willful blindness, or deliberate ignorance, of facts, or his failure to adequately supervise those that committed crimes. *He never acknowledged personal responsibility for committing a crime to me.*

(Doc. No. 591-1 ¶ 17 (emphasis added); accord, e.g., id. ¶¶ 26-27, 31-32, 37, 57, 69.) Moreover, even during those occasional "interludes" in which Petters expressed some willingness to plead guilty, he indicated he would do so only in exchange for a term of imprisonment no greater than 20 years. (See supra at 14 & note 3.) There is no reason to believe he would have taken the Government's 30-year deal.

Petters's assertions, in his Affidavit and at the evidentiary hearing, that he would have accepted a plea offer do not change the calculus. In the Eighth Circuit, in order to obtain relief for ineffective assistance, a defendant "must present some credible, non-conclusory evidence that he would have pled guilty had he been [] advised" of a potential plea agreement. Engelen v. United States, 68 F.3d 238, 241 (8th Cir. 1995). For the reasons set forth above, the record here is devoid of such evidence. See also, e.g., Sanders, 341 F.3d at 723 (court properly rejects ineffective-assistance claim based on

asserption defendant would have accepted government's plea offer where it is "inherently incredible in light of the record").

For all of these reasons, Petters's ineffective-assistance claim fails. He cannot show counsel rendered deficient performance under <u>Strickland</u> because he has failed to demonstrate either that a formal plea offer was made or that the so-called offer was not communicated to him. And he cannot show prejudice under <u>Strickland</u> because he has failed to demonstrate that he would have accepted the alleged deal before trial.

## IV.    Petters's sentence was not constitutionally infirm

In addition to ineffective assistance, Petters also contends in his Motion that his 50-year sentence violated the Eighth Amendment's prohibition on cruel and unusual punishment because it was "disproportionate to the crime[s] of conviction." (Def. Mem. (Doc. No. 579) at 8.) The Court will put aside the Government's argument that this claim has been procedurally defaulted[5] because it is easily dispatched on the merits. <u>See</u> <u>Barrett v. Acevedo</u>, 169 F.3d 1155, 1162 (8th Cir. 1999) (*en banc*) ("Although the procedural bar issue should ordinarily be resolved first, judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated.").

---

[5] As noted above, a § 2255 Motion "may not do service for an appeal," <u>Frady</u>, 456 U.S. at 165, and accordingly claims that could have been brought on direct appeal but were not – such as Petters's Eighth Amendment claim here – are procedurally defaulted unless the movant can show "(1) cause for the default and actual prejudice or (2) actual innocence." <u>United States v. Moss</u>, 252 F.3d 993, 1001 (8th Cir. 2001). Petters asserts ineffective assistance of appellate counsel as cause for his default here, claiming that the Eighth Amendment issue was directed to this Court's attention at sentencing but inexplicably omitted from his appeal. (Def. Reply Mem. (Doc. No. 597) at 12-13.)

Petters is indeed correct that the Constitution's prohibition on cruel and unusual punishments includes a "narrow proportionality principle" that "prohibits . . . sentences that are disproportionate to the crime committed." Ewing v. California, 538 U.S. 11, 20, 22 (2003). But as noted in Harmelin v. Michigan, "[t]he Eighth Amendment does not require *strict* proportionality between crime and sentence. Rather, it forbids only *extreme* sentences that are *grossly disproportionate* to the crime." 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part and concurring in the judgment) (emphases added) (internal quotation marks and citations omitted); accord Ewing, 538 U.S. at 23-24 (adopting Justice Kennedy's formulation of proportionality). Hence, successful challenges to the proportionality of particular sentences are "exceedingly rare." United States v. Weis, 487 F.3d 1148, 1153 (8th Cir. 2007) (quoting Harmelin, 501 U.S. at 1001). This is not one such "exceedingly rare" case.

In Harmelin, the Supreme Court affirmed a life sentence without parole for a first-time offender possessing less than one kilogram of cocaine. If a life sentence was appropriate in Harmelin, it is difficult to conceive how the sentence imposed in this case was "grossly disproportionate." Petters was convicted of 20 separate felony offenses. The scale of his crimes was enormous; the Ponzi scheme, which he conceived and spearheaded, resulted in massive financial losses by hundreds if not thousands of victims, some of whom testified they lost every penny they had. Countless lives were ruined or substantially disrupted. The sheer size and scope of the fraud and Petters's role therein resulted in an advisory Sentencing Guidelines range of life imprisonment, which was necessarily reduced to 335 years in prison, the sum of the statutory maximum penalties

for his crimes.  Petters, of course, received far less.  The Court perceives no constitutional infirmity under these facts.

Engaging in a purely mathematical exercise, Petters points to the sentences imposed in other fraud causes, utilizing a ratio of the losses there and here to argue his sentence was unlawful.  (See, e.g., Def. Post-Hr'g Mem. (Doc. No. 626) at 10 (discussing Allen Stanford:  "Stanford was ordered to serve 110 years in prison, or more than double Defendant Petters' sentence[,] even though the loss [there was] seven times greater than the . . . loss in the instant case.  Defendant Petters' proportionate sentence, in comparison, would be approximately 15 and one-half years.").)  But the amount of loss caused by a crime is only one factor considered by the Court at sentencing – the number of victims, the defendant's role in the offense, the need to deter recidivism, the defendant's prior criminal history, and a host of other factors all come into play.  See generally 18 U.S.C. § 3553(a).  In other words, each case is unique and must stand on its own facts, and mathematical precision between sentences, even in "comparable" cases, is neither achievable nor necessary.  See United States v. Myers, 503 F.3d 676, 686 (8th Cir. 2007) ("A sentence is not unreasonable simply because it creates some disparity between sentences.").  Simply put, the Court concludes Petters's 50-year sentence did not flout the Eighth Amendment.

## V.      No Certificate of Appealability will issue

For these reasons, Petters's claims fail.  The Court anticipates, however, that he will seek appellate review of this Order.  To appeal a final order in a proceeding under § 2255, a defendant must obtain a Certificate of Appealability.  28 U.S.C.

§ 2253(c)(1)(B).  A district court cannot grant a Certificate of Appealability unless the defendant "has made a *substantial showing* of the denial of a constitutional right."  Id. § 2253(c)(2) (emphasis added); accord, e.g., Williams v. United States, 452 F.3d 1009, 1014 (8th Cir. 2006).  A Certificate of Appealability will not issue simply because an appeal might be pursued in good faith, raising non-frivolous issues.  See Kramer v. Kemma, 21 F.3d 305, 307 (8th Cir. 1994) ("Good faith and lack of frivolousness, without more, do not serve as a sufficient bases for issuance of a certificate under 28 U.S.C. § 2253.").  Rather, the movant must show that the issues are "debatable among reasonable jurists," that different courts "could resolve the issues differently," or that the issues otherwise "deserve further proceedings."  Cox v. Norris, 133 F.3d 565, 569 (8th Cir. 1997).

The Court concludes that Petters cannot meet this exacting standard here.  His claims have been fully addressed and lack merit; the Court does not believe they are "debatable among reasonable jurists."  Id. at 568.  Petters has not shown sufficient reason to believe that any other court – including the Eighth Circuit – would decide this case any differently than it was decided here.  And, he has not identified, and the Court cannot independently discern, anything novel, noteworthy, or worrisome about his case warranting appellate review.

## CONCLUSION

Like so many before it, this great American tragedy, in which money was lost, lives were ruined, and more than a dozen people have been sent to prison, has come to an end.  Petters's last-ditch attempt to escape just punishment for his crimes does not hold

water; he received constitutionally effective counsel and his sentence was not unlawful. He is entitled to neither relief nor sympathy from this Court.

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Petters's Motion (Doc. No. 578) is **DENIED**.  The Court further **DECLINES** to issue a Certificate of Appealability.

**LET JUDGMENT BE ENTERED ACCORDINGLY** in Civil No. 13-1110.


Date:  December 5, 2013

s/Richard H. Kyle_____
RICHARD H. KYLE
United States District Judge